SAVANNAH & N. Y. TRANSP. CO. v. KLAREN BRIDGE CO.

(Circuit Court of Appeals, Fourth Circuit. July 3, 1918.)

No. 1593.

1. NAVIGABLE WATERS &#x22FA;20(3)—BRIDGES—INJURY BY VESSEL.
    Bridge over navigable waters, built according to plans approved by Secretary of War, as required by River and Harbor Act, as amended by Act July 13, 1892, § 3, and repaired on his direction, as required by Act March 3, 1899, § 18 (Comp. St. 1916, § 9970), may not as a nuisance, because of narrowing of original width, be injured without liability by a passing vessel; but the test is whether the narrowing was a proximate cause of the collision.

2. SHIPPING &#x22FA;86(3)—BRIDGES—INJURY BY VESSEL—QUESTION FOR JURY.
    Whether slight narrowing of span of bridge over navigable waters was proximate cause of vessel injuring it is a question for jury on conflicting evidence as to point of collision.

3. SHIPPING &#x22FA;86(3)—TOLL BRIDGES—INJURY—DAMAGES.
    Relative to damages from injury of toll bridge by vessel, no deduction is to be made from what gross receipts would have been during period of repairs; bridge company's operating expenses not being lessened.

---

In Error to the District Court of the United States for the Eastern District of South Carolina, at Charleston; Henry A. Middleton Smith, Judge.

Action by the Klaren Bridge Company against the Savannah & New York Transportation Company. Judgment for plaintiff, and defendant brings error. Affirmed.

J. P. K. Bryan, of Charleston, S. C., for plaintiff in error.

H. L. Erckmann, of Charleston, S. C. (H. H. Ficken, of Charleston, S. C., on the brief), for defendant in error.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

PRITCHARD, Circuit Judge. This case comes here on a writ of error to the District Court of the United States for the Eastern District of South Carolina. The facts may be epitomized as follows:

Wappoo cut, or creek, is a narrow navigable stream in the state of South Carolina, running westwardly from the western bank of the Ashley river opposite the city of Charleston. In January, 1897, Wappoo Bridge Company received a charter from the state authorizing it to operate a toll bridge. The General Assembly of South Carolina then passed an act, approved the 11th of February, 1898, authorizing the bridge company to erect a toll bridge across the stream above mentioned. 22 St. at Large, p. 952. Act Cong. July 13, 1892 (27 Stat. 110, c. 158), required the location and plans of the bridge to be submitted to the Secretary of War and approved by him. This was done. The plans, among other things, required the draw span opening to be 66 feet in the clear, and also called for batter piling behind certain parts of the fenders. This was done, and the bridge was built according to the plans and specifications duly approved.

The bridge was thrown open to the public on January 10, 1899. The Klaren Bridge Company, defendant in error (chartered in 1906), became the owner of such bridge and proved title thereto. It seems that in the course of repairs during the years many of the batter piles called for by the plans rotted away and were not replaced. Further, owing to bad measurement or due to action of the tides, the opening had slightly sagged and bulged in some parts, so that, instead of being 66 feet, the eastern half ran from 66 feet to 67 and 68 feet (more than required by law) in the clear, and portions of the western half ran from 66 feet to as low as 64 $3/10$ feet.

The Secretary of War, under Act March 3, 1899, c. 425, § 18, 30 Stat. 1153 (Comp. St. 1916, § 9970), when he has reason to believe that a bridge is an obstruction on account of its draw span, is required to make the owner alter same so as to render navigation free. It appears that this bridge was inspected on a number of occasions by the United States engineer, representing the Secretary of War, and on January 10, 1917 (the time of the accident), there was no demand on the part of the War Department remaining uncomplied with, but all work had been done to the satisfaction of the engineer in charge. The middle fender (the one injured) was only two years old, and the government had required certain changes since 1906. Testimony was intro-

duced to show that the middle fender (the one alleged to be injured) was strong and substantial.

From 50 to 100 vessels were accustomed to pass through the drawbridge daily; this including all kinds of vessels with the exception of large sea-going barges. On January 10, 1917, the Savannah & New York Transportation Company, plaintiff in error, attempted by its tug Passport to tow a large sea-going barge from the Ashley river in a westerly direction through this bridge, going to Wiggins, S. C. The testimony shows that the barge was 180 feet long, 40 feet wide, and stood out of the water 14 to 18 feet, and drew 7 feet of water. It appears that Capt. Nelson had been advised by an experienced local pilot not to attempt to take the barge through by this route. Capt. Nelson had no sea-going license. The barge captain testified that it was almost impossible to go through the bridge with that barge without coming in contact with the fenders.

For some reason, the tug or barge, on entering, struck the northeast fender. The Klaren Bridge Company alleges that the tug did it; that both were painted green. The barge had fenders, and green paint was found on the northeast fender after the accident, which was never there before. Witness testified that the northeast fender was hit, but did not give way; that the tow became unmanageable, and the barge crossed over to the southern fender and crashed into it with a "powerful noise." L. B. Sauls, the bridge keeper, living about 80 or 90 feet from the bridge, testified to hearing the scrape on the northeast fender, and that he came out to the foot of the bridge, saw the barge strike the draw fender east of the cylinder; that it broke the fender, struck the draw, and kept striking, going right on down; and that after it had cleared the bridge there was considerable noise and confusion, and cries, repeated three or four times, from the tug, "I told you to pull hard over." The record shows that the southern fender was broken, and the iron drawbridge injured and damaged.

The evidence shows that bill for actual repairs amounted to $2,129.43; the bridge was put out of commission for nearly three months, with loss of tolls, estimated on basis of previous year, $514.17; extra lumber cost $17.25; use of wagon, $105; or total of $2,832.94. The case went to trial before a jury during the June, 1917, term of the District Court, at Charleston. At the conclusion of the testimony plaintiff in error moved for a directed verdict, which was refused. The jury found a verdict of $2,832.94, which was reduced by the presiding judge to $2,732.94, and judgment duly entered accordingly. The defendant in error will hereinafter be referred to as the plaintiff, and the plaintiff in error will be referred to as the defendant; such being the relative positions the parties occupied in the trial at the court below.

[1] The defendant insists that the plaintiff is not entitled to recover in this action by virtue of section 7 of River and Harbor Act Sept. 19, 1890, c. 907, 26 Stat. 454, as amended by 27 Stat. 110, § 3, which is in the following language:

"It shall not be lawful hereafter to commence the construction of any bridge, bridge draw, bridge piers and abutments * * * over or in any * * * navigable river or navigable waters of the United States under any act of the legislative assembly of any state until the location and plan of such

bridge * * * have been submitted to and approved by the Secretary of War. * * *"

At the trial in the court below witness Dawson, who states that bridge was built according to plans and specifications, testified as follows:

"I was the engineer who made the plans of the bridge, as is shown upon the plan. According to these plans the bridge was adopted and accepted by the company and accepted by the government. I superintended the construction, and at the time the bridge was so constructed it did conform to the plan in 1898, when it was built."

According to this witness the bridge was erected in accordance with plans that had been approved by the War Department. The important question involved herein is as to whether a bridge built in accordance with the law becomes, on account of wear, tear, and incidental repairs, with unsubstantial variations from the original plans, an unlawful structure, which may be injured by a passing vessel, without such vessel incurring liability to the owner of the bridge, regardless of the fact as to whether such variations or defects were approximate cause of the injury or not.

We do not think that the section first above quoted applies to the case at bar, but relates solely to the construction of bridges in the first instance. However, we are of the opinion that 30 Stat. 1153, § 18, is intended to apply to a case like the one at bar. This section is in the following language:

"That whenever the Secretary of War shall have good reason to believe that any railroad or other bridge now constructed, or which may hereafter be constructed, over any of the navigable waterways of the United States is an unreasonable obstruction to the free navigation of such waters on account of insufficient height, width of span, or otherwise, or where there is difficulty in passing the draw opening or the draw span of such bridge by rafts, steamboats, or other water craft, it shall be the duty of the said Secretary, first giving the parties reasonable opportunity to be heard, to give notice to the persons or corporations owning or controlling such bridge so to alter the same as to render navigation through or under it reasonably free, easy, and unobstructed; and in giving such notice he shall specify the changes recommended by the chief of engineers that are required to be made, and shall prescribe in each case a reasonable time in which to make them."

This act also prescribes a penalty or fine not to exceed $5,000 for noncompliance with the act. It also vests the Secretary of War with the power to require changes.

Maj. Youngberg, a witness introduced on behalf of the defendant, among other things testified as follows:

"The records of my office show that the bridge has been inspected on number of occasions from the date of erection or date of beginning work up to the present time. I don't recollect any repairs remaining not complied with on the 10th of January, 1917."

According to the testimony of this witness the bridge had been inspected from time to time by the United States engineers, and there had been no demand which had not been complied with at the time of the accident.

The defendant's contention is tantamount to saying that, inasmuch as the bridge company, in repairing the bridge, made variations of a few

inches in the width of the same at one point, such action on the part of the bridge company conferred upon the navigator the right to strike the bridge at another point, where there was no variation from the original plan, and thereby demolish the same. In other words, counsel for defendant proceeds upon the theory that whereas, in this instance, an immaterial variation existed, the right thereby devolved upon the public to abate the same as a nuisance. It cannot be reasonably claimed that Congress could have intended to convey such meaning, and one only has to read the plain provisions of the statute to find that they do not justify such a construction.

We find the following in the A. & E. Encyclopedia of Law, vol. 1, pages 84, 85, which we think is very pertinent to the question at issue:

"The right to abate is limited to the removal of that in which the nuisance consisted; and for any excess of abatement the party abating will be liable to an action. Where there are more ways than one of abating a nuisance, he must choose that which is the least mischievous to the wrongdoer."

We think the case of Ft. Plain Bridge Co. v. Smith et al., 30 N. Y. 44, is very much in point; also the case of Miss. & Missouri R. R. Co. v. Ward, 2 Black (67 U. S.) 485, 17 L. Ed. 311. In the last-mentioned case there was a conflict of evidence as to whether the variance was a substantial deviation from the original construction sufficient to warrant the inference that the variation was a concurring, contributing, proximate cause of the accident, so as to exonerate the defendant from liability, even if it were found to have been negligent. The court very properly submitted this question to the jury.

The learned judge who tried this case in the court below, in referring to the construction of the bridge in question, among other things, said:

"I charge you that the requirement of law is that that bridge must be constructed and maintained according to the requirements of the plans approved and sanctioned by the Secretary of War. I charge you further that if any one constructed such an obstruction as a bridge, assuming it to be under the authority of the state and of the permission of the Secretary of War, and does not construct it so as to conform with the plans and regulations, it is an unlawful structure, and the person who constructs it is under the statute liable to a severe penalty, to be inflicted by the United States, for disobeying the requirements of the plans in the construction or maintenance of that bridge, and is also liable by the United States authorities to be ordered to remove it, and make it conform to those plans. No matter what the circumstances may be, they can be required to move or alter it, or change it to conform to those plans. It is an unlawful structure in that sense; but I charge you that it is not an unlawful structure in the sense that anybody has a right to go and knock it down or move it, or disregard it. To illustrate what I mean: If a wharf is authorized by the United States to extend towards the channel 66 feet, and the wharf owner, through inattention or inadvertence, constructs to 67 feet, that does not mean that anybody can hurl a heavy barge against it, the whole pier, or that he can destroy a part of the wharf, or that he can take an ax and destroy the wharf because the requirement at the time was disobeyed, and it was constructed 67 feet out in the channel, instead of 66 feet. So I charge you, gentlemen, that if a person or a corporation is authorized to construct a bridge and he is directed by the plans to construct it with a draw 66 feet in width, and he constructs it 65 feet, or 65 feet 11 inches, so as to be less than the requirement by 1 inch, that does not authorize anybody to destroy that bridge, or hurl a boat, or any other object which will hurt it, against it, and destroy it because the party who constructed it may have made an immaterial and unsubstantial alteration and have disobeyed

the requirements of the plans. The remedy in those cases is not that the whole bridge is declared outlawed, open to destruction and to be ignored by any one, but that the party should be reported, and required under the statute by the War Department to tear down his bridge and reconstruct it, if necessary, as the War Department may accept and ratify, or the party is liable to prosecution and punishment by fine for not having obeyed the plans; but, because he has done it, he is not open to have his property destroyed as if he were an outlaw. His bridge is there, and has been authorized to be there, though required to be put there according to the plans approved by the War Department; yet a variation between those plans and the actual structure does not mean that the party who constructed it forfeits all right to his property or to the use of it.

"I therefore charge you in this case that the fact that the draw in this case may at this time, nearly 20 years after the original authorization of the construction of the bridge, vary from the width required by the plans to the extent of 19 inches, does not mean that anybody who wishes may disregard the whole authority for the construction of the bridge, and treat it as an unlawful construction existing, which they can destroy, and for which the party owning it is not entitled to any remedy or reparation if it is carelessly or negligently destroyed; if it is not constructed according to the plans, not only is he subject to prosecution under the statute, but to the general common law that he must place no obstruction in navigable waters which causes injury as the proximate cause, because a man is not liable to another simply because he has an obstruction in the navigable water. He is only liable if that unlawful obstruction is the cause of injury to another, to the individual, as distinguished from the government, and therefore I charge you in this case that not only if he did not follow the plans is he still bound by the law that his obstruction must not be one that is such an obstruction to the navigable stream as in any case causes injury to a party; but I charge you that, if that draw was less than 66 feet, he is not entitled on the construction of the draw to any protection as having fully complied with the plan in this respect. If he constructed it 66 feet wide, then any boat that touched or injured that bridge was negligent. If he conformed to the law and constructed it full 66 feet wide, then that was the requirement of the law, and no boat passing through that draw had the right to strike the fender and obstruction on either side, so as to injure it; but if he constructs it at less than 66 feet he is deprived of that absolute protection, and a party who strikes it is not presumptively negligent or careless, but the bridge owner would be presumptively in fault, unless he can show that the lessening of the width, if the jury find it to be unsubstantial, was not any one of the factors or causes which contributed to the injury. What I mean is this, gentlemen, to put it more concretely to you: If the law authorized the construction of a bridge there with a width of 66 feet, any boat that goes through there is expected to do so without striking anything at the side. She is notified by law that she has a clear way of 66 feet, and no more, and is to be piloted, managed, and guided accordingly; and if she strikes within the 66 feet, when it is 66 feet, unless he can show it was due to some uncontrollable cause, which exists whenever you deal with navigation, a boat that strikes is presumptively negligent; but, if it is less than 66 feet, then that presumption is destroyed, and the bridge owner is entitled to recover from the boat it strikes or injures only if he can show that lessening of the width was in no way responsible for or contributed to the accident or disaster. * * *

"If there was, if the barge was so navigated and towed through that lane or bridge way, so that it was carelessly and negligently allowed to strike against the side with an impact not simply incident to the usual and ordinary impact of a boat going through, then I charge you you would be authorized to infer that there was negligence on the part of the boat. Now, it is for the jury to say: Was it negligently carried through, so as to strike the bridge structure? And if it did, and broke it down, and in consequence of such carelessness and negligent management it then struck against—directly or indirectly against—the swinging bridge and injured that, then I charge you that the defendant would be in the first instance responsible. In this case there is no

question of narrowing of the waterway at the swinging bridge itself, because the testimony is that at the time the bridge was completely swung away, off the waterway, did not protrude to one side, and the only question is: Was this barge so unskillfully handled by the tug which was towing it, by the people on board the barge, that she by any unskillful management struck against those piles and injured the bridge structure and the bridge? If that was due to the negligence of the parties on the tug or the barge, then they are responsible. But, however, if you find that that was due to the fact that the draw opening at that point was 64 feet 5 inches, and not 66 feet, that the diminution of it by 1 foot 7 inches was the contributive cause of that striking against the bridge, then they would not be responsible, as, for instance, if a boat which had a beam of 65 feet could be safely carried through, and when she got to a place where the width was reduced to 64 feet 5 inches, there was 7 inches too little, why then that would manifestly be the responsibility of the bridge, because the boat that went through was entitled to 66 feet, and if 65 feet prevented it from going through it, with only 64 feet 5 inches it would be the responsibility of the bridge. That is, of course, an extreme case.

"Now, I charge you in this case that, if you find that this boat, which was 40 feet beam, that the lessening of the draw opening to 64 feet 5 inches at that point was a concurring, contributing, proximate cause of the injury, was the concurring thing in making the boat strike, it would be contributory negligence on the part of the bridge owner, and although there may have been unskillful management of the tug in causing it to strike in the first instance, the tug owner or barge owner would not be responsible, and that is pretty much this case. There has been some evidence, I charge you, as to the condition of the iron structure of the bridge, but the testimony is that that was all removed from this draw opening; that, therefore, could not be a contributing cause to the accident at all, and the only contributing causes in this case, shown upon the testimony, that would justify the jury in finding it, are: First, the lessening of the draw width; and, next, the decayed—if you find it existed—rotten condition of the fenders and piles, that they were in an unsafe condition. Now, if you find that those piles and fenders were so decayed as not to be able to withstand the ordinary, usual bump, scrape, touch, or contact to the sides in the passage of a boat of this size through that draw opening, then I charge you you are also authorized to find that there was contributing negligence on the part of the plaintiff, provided that was a concurring, contributing, proximate cause of the accident. Under the testimony those are the only two causes which are shown to have been capable of contributing to the injury here. One is the lessening of the size of the draw by 19 inches; the other is by the condition of the piles and fenders, shown not to be in accordance with the plans, according to the testimony to have been in a decayed condition; if either of those factors, the lessening of the width of the draw or the condition of the piles and fenders, were in any wise the contributing, concurring, proximate cause of this accident then the plaintiff is not entitled to recover."

We think the court below clearly stated the law bearing upon the facts and circumstances surrounding this transaction. This being a case where the government is not proceeding against the bridge company to recover penalty for failing to construct the bridge in strict compliance with the plans and specifications as approved by the Secretary of War, and it appearing that the bridge was originally constructed in accordance with law, the positive duty imposed upon a bridge company by section 7, 27 Stat. 110, supra, does not apply. That portion of the charge to the jury which we have just quoted clearly distinguishes the instant case from a case where the government seeks to recover a penalty, due to failure of the bridge company to comply with the requirements of the government in the construction of a bridge in the first instance.

[2] In view of the facts and circumstances as shown by the testimony, we think the judge very properly permitted the jury to say whether the variation was a material one, and, if so, whether it was the proximate cause of the accident; there being conflicting evidence as to the width of the span where collision occurred. In other words, there was conflicting testimony as to where the collision actually occurred. The case of Missouri River Packet Co. v. The Hannibal, etc., Rwy. Co. (C. C.) 2 Fed. 285, is very much in point. There the construction of a bridge was authorized by an act of Congress to have a span not less than 160 feet in the clear. The court held in that case that a bridge was not a legal structure unless constructed according to specifications. The court further charged as follows:

"Though we may find from the testimony that the width between the piers as constructed was less than the act of Congress requires, yet the violation of law by the defendant is not available to plaintiff in recovering damages unless it caused or contributed to the injury by plaintiff complained of."

The cases of Grand Trunk Railway Co. v. Ives, 144 U. S. 408, 12 Sup. Ct. 679, 36 L. Ed. 485, and Union Pacific Ry. Co. v. McDonald, 152 U. S. 283, 14 Sup. Ct. 619, 38 L. Ed. 434, are pertinent, and fully sustain the action of the court below in submitting the question to the jury as to the width of the draw span; also, as to whether any of the factors of this case contributed to the injury as proximate cause.

[3] There are a number of exceptions, but we have already disposed of practically every point presented. Without entering into further discussion of the various questions raised, we are of the opinion that the assignments of error are without merit. There is one point, however, involved in exception No. 15, which we will refer to in passing. It is insisted that the court below erred in refusing to charge the twenty-first request of defendant, which is in the following language:

"The jury are further instructed that the plaintiff cannot recover the gross receipts of toll collections that he would have received during the time the bridge could not be used, but only the net receipts for such time; that is, the gross receipts less the operating expenses."

In refusing this request the court said:

"I charge you that, if the expenses followed, he is entitled to recover the gross receipts. As to that, however, I shall make up my mind, and allow a remittitur if I find it is incorrect."

Later the court considered this question on defendant's motion for a new trial, and reduced the verdict $100 on account of the previous damage to the cord east of the cylinder, thus taking into consideration the net loss to plaintiff. Instead of the evidence showing that the expenses were curtailed during the interim as a result of the damage, it clearly appears that the keeper of the bridge and the president of the bridge company continued working in the meantime. In addition to this, the plaintiff lost the interest on the money necessarily expended in making repairs, and the extra work of Klaren in superintending the work should be considered. Under these circum-

stances, we think the ruling of the lower court is entirely justified and proper.

We think that the jury was warranted in finding that the damage sustained by the plaintiff was occasioned by the neglect of the defendant. The jury having found such to be the case, we are not inclined to disturb their verdict.

For the reasons stated, the judgment of the court below is affirmed.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes