## CITY OF CHICAGO v. WISCONSIN S. S. CO.

(Circuit Court of Appeals, Seventh Circuit. October 3, 1899.)

No. 550.

1. NAVIGABLE WATERS—BRIDGES—NEGLIGENCE IN CONSTRUCTION OF DRAW.
    Where the draw of a bridge maintained by a city over a navigable stream is provided with a lock at one end, sufficient to hold it in position when open, under ordinary circumstances, the city is not chargeable with negligence because such lock is not sufficiently strong to withstand the

impact of a vessel striking against the side of the draw at the opposite end, or because the draw is not locked at both ends.

**2. SAME—SUIT FOR INJURY OF VESSEL—BURDEN OF PROOF.**

In a suit against a city to recover for an injury caused by the draw of a bridge swinging out and striking a passing vessel, where there was evident fault on the part of the vessel or the bridge tender, but it is not satisfactorily located by the evidence, the libel will be dismissed.

Appeal from the District Court of the United States for the Northern District of Illinois.

This was a libel in personam by the Wisconsin Steamship Company against the city of Chicago to recover damages for injuries to libelant's steamer, the Thomas Davidson, then in tow of the tug William Dickinson, by collision with the Indiana Street Bridge, which occurred May 13, 1895, through the alleged negligence of the bridge tender.

The undisputed facts of the case were as follows: The bridge crosses the north branch of the Chicago river from east to west, and rests upon a turntable built upon piles in the middle of the river. The bridge swings north and south, and, when open, is supported upon what is known as the "center protection," which extends the whole length of the draw up and down the river, north and south. It is constructed upon piles driven into the bottom of the river, bound together and planked over with a stringer around it, and forms a sort of a platform upon which the bridge, when open, rests. The bridge was 32½ feet in width; the platform 35½ feet, projecting beyond the bridge a distance of nearly 2 feet upon either side. The bridge proper hung about 9 feet above the water. The main channel of the river was on the west or starboard side of descending vessels. The draw of the bridge was swung upon the center, but was locked at the north end only. This lock was formed by the dropping of a bar attached to the bridge into a socket standing up from the protection.

The steamer was 312 feet long, 42 feet beam, and, had she been kept in the center of the channel, would have had 2½ feet clear upon either side.

The collision occurred a little while after dark, as the steamer came down the north branch of the river, and passed through the westerly channel of the draw. As she was passing through, from some cause, the north end of the bridge swung into the channel, and over the port quarter of the steamer, carrying away some of her upper works, including her after-cabin. The allegation of the libel in this connection is that "the steamer had almost got through the draw of said bridge, when the bridge tender carelessly and negligently swung said bridge in and over the side of said vessel near the stern and at her quarter, and caught the forward end of said steamer's boiler house, crushing it in, and knocking down her smokestack, breaking her steam pipes, and blowing off the steam," etc.; and further, "that the said bridge tender caused said bridge to swing so unexpectedly and suddenly that there was nothing the master of said steamer could do to avoid the accident, and that said accident occurred solely through the negligence and unskillfulness of said bridge tender in causing said bridge to run foul of and against said steamer as aforesaid."

This allegation of fault was practically abandoned upon the hearing, and the cause tried upon the theory, not that the bridge tender negligently swung the bridge as the steamer was passing through, but that the bridge had not been swung over in line with the center protection and locked, as it should have been, but was left so far out of line that the bow of the propeller struck it at the southerly end, and thereby caused the north end to swing over the propeller.

Upon a full hearing upon pleadings and proofs, the district court was of opinion that the collision occurred either by reason of the fact that the bridge was not exactly parallel with the protection, and that the south end projected into the river, or because the bridge was not locked at both ends, as, in its judgment, it should have been. A decree was accordingly awarded against the city for $3,006.87, from which respondent appealed to this court.

Charles E. Kremer, for appellant.

Robert Rae, for appellee.

Before BROWN, Circuit Justice, and WOODS and JENKINS, Circuit Judges.

BROWN, Circuit Justice (after stating the facts as above). The material question in this case is whether the bridge, as the tow approached the draw, was in line with the center protection or pier, and was properly locked at its north end. If it were not exactly in line, then the south end probably projected into the draw, and, as there was only a margin of $2\frac{1}{2}$ feet on each side of the steamer, a blow against the south end of the bridge would thrust it to the eastward, with a corresponding movement of the north end to the westward, which would carry it directly over the port quarter of the steamer. Upon the other hand, if the bridge were directly in line with the center protection, and properly locked, it is difficult to see why the whole duty of the city to the steamer was not discharged, as the protection projected beyond the bridge on either side a distance of $1\frac{1}{2}$ to 2 feet, and the steamer would encounter and be warded off by the protection before it touched the bridge.

The presumption and the probabilities are that the bridge tender performed his whole duty in this particular. The direct testimony is all to the same effect. Not only does the tender swear that the bridge was locked, but the master of the steamer, who was standing on the pilot house, in full view of the bridge, says there was nothing in the situation to apprise him of any danger of collision, and that the bridge seemed to be perfectly parallel with the abutment, so that it could not have projected over any; and that, after he had passed the lower end of the center protection, he suddenly heard a crash, which he at first thought was an explosion. There is no testimony to contradict this.

The only allegation of negligence in the libel is that "the bridge tender carelessly and negligently swung the bridge over the vessel." There is absolutely no testimony to support this theory, and it may well be doubted whether such evidence as there is of negligence is not a material departure from the allegations of the libel, though it is probably too late to raise a question of variance in the appellate court. The bridge tender, in this connection, swears that, as the vessel passed, he was standing against the lever by which the bridge is swung, and that as he was standing there, watching, he received a sharp blow in the back, which knocked him over, and rendered him nearly unconscious. When he got up, the lever had gone around three or four times, and the bridge was over the boat. If this testimony be true,—and it seems by no means improbable,—it indicates almost conclusively that some great force was suddenly brought to bear upon the south end of the bridge, which caused an abrupt and violent motion of the bridge lever.

The negligence now relied upon is that the bridge tender failed to lock the bridge, by reason whereof the south end was struck by the steamer, and the north end driven over her port side. As already observed, there is no direct testimony to this effect, and the fact that the center protection projected beyond the bridge indicates that the steamer would come in contact with the protection before it could touch the bridge.

The fact that the steamer must in some way or other have hit the bridge is accounted for by the respondent by an elm fender hanging over the port bow of the steamer—a stick of timber about 22 feet long, 12 inches wide, and 7 thick—coming in contact with the bridge. This fender was hanging over the side of the vessel at a point forward of where the vessel is widest, or where it begins to taper towards the bow. At this point the steamer was wider on deck than at her water line, tapering gradually from the deck to the keel. Her draft at this point was between 5 and 6 feet. The theory is that, as the steamer came up against the center protection, the bottom of the fender would be shoved in against her side, while the rail at the deck line, or near it, would press against the middle of the fender, and, the upper portion being held firmly by a strap to her side, the deck would make of the fender a bent bow, and as the bow was being bent by the shape of the vessel and her weight against the center protection, the fender could not withstand so great a strain, and broke at a point about 3 feet from the upper end; that, as it broke, it violently shot out and struck the bridge (this blow being followed by a continuous pressure), and started it, notwithstanding the fact that it was locked at the north end. In corroboration of this, libelant's testimony tended to show that immediately after the collision the lower end of the fender was taken out of the water where it had fallen, while the other end remained on the bow of the boat; that there was also paint upon the fender of the color of the bridge, and that certain slivers from the fender were also taken from the damaged portion of the bridge. Libelant's explanation of this is that the fender was not broken that night, but that two days thereafter, in coming down from the Union Elevator, the propeller got athwart the draw of another bridge, and required the assistance of tugs to pull her off; and in some way the fender got broken against the chains that went around a clump of piles at the protection. This directly contradicted the testimony of the respondent, which indicated that the lower end of the fender was picked up immediately after the collision, and laid upon the abutment of the bridge.

However improbable it may seem that a stick of timber of the size of this fender could have been broken in the manner indicated, the testimony upon both sides tends to show that it was broken substantially in this way, either that night, by coming in contact with the bridge, or within a day or two thereafter, by coming in contact with another bridge at Sixteenth street.

We think the city cannot be charged with negligence in failing to have a lock at both ends of the bridge, though that probably would have lent additional safety. The object of the lock is merely to hold the bridge in position over the center protection, and not to resist the impact of a moving vessel. The lock is simply a revolving iron pulley of five or six inches in diameter that falls into a groove or notch of the size of the pulley at the end of the latch, and half its diameter in depth, so that it would not be difficult, with a strain on the bridge, to have the latch roll out of the notch or groove into which it falls. While such additional lock might have increased its resisting power, it is merely a matter of conjecture whether it would

have been sufficient to prevent a collision. There is no allegation in the libel upon the subject. The duty of the city in that regard was not to supply every possible protection, but only such as experience shows to be necessary in the usual use of the bridge. We think the city was not bound to go further, and provide appliances which would enable the bridge to resist the impact of a heavy steamer.

We do not think the mere fact that the north end of the bridge inflicted the injury shifts upon the city the burden of accounting for it and exonerating itself. This injury was so obviously the effect of a sudden thrust at the south end that it belongs to the steamer to establish the fault of the city there.

Upon the whole case we are of opinion that, while the actual facts are by no means free from doubt, libelant has not made out its case by a preponderance of testimony. If there be any such preponderance, one way or the other, it is rather in favor of the respondent. Where fault is evident, but cannot be satisfactorily located, the libel should be dismissed. The Worthington and Davis, 19 Fed. 836.

The decree of the court below must therefore be reversed, and the case remanded, with directions to dismiss the libel.