NEWTOWN CREEK TOWING CO. v. CITY OF NEW YORK.

District Court, S. D. New York.

May 12, 1930.

Alexander & Ash, of New York City (Edward Ash, of New York City, of counsel), for libelant.

Arthur J. W. Hilly, Corp. Counsel, of New York City (William J. Leonard, of New York City, of counsel), for respondent.

WOOLSEY, District Judge.

This libel must be dismissed, with costs.

The bridge at which the accident sued for herein occurred crosses Newtown creek at Greenpoint avenue. It is a swinging bridge, and the arc of its swing is one hundred and eighty degrees in either direction and the radius thereof is about eighty feet. It is supported in its center on what is called the center pan. This contains the revolving machinery which is electrically operated. When the bridge is fully open, there is a passage, between seventy and eighty feet wide, for vessels on each side of the center pan and its abutments.

When a signal is given by a vessel which wishes to pass through, it is necessary for those in charge of the bridge first to clear the vehicular traffic off it and then to open it. Depending on the traffic conditions on the bridge, this takes from three to five or six minutes. After traffic is cleared, it takes from a minute to a minute and a half to open the bridge fully.

On August 27, 1927, the tug Wonder, which is owned by the libelant, and whose captain was accustomed to take tows up Newtown creek almost daily, assembled at the mouth of Newtown creek a tow consisting of the barges Benton J. Reynolds and Mulqueen. The barges were loaded with coal destined to points above the Greenpoint bridge.

The tow was arranged tandem with the Reynolds, which was towed stern first, as the leading barge. The hawsers were short—that between the Reynolds and the tug being about fifteen feet long. The tide was flood and the weather clear.

The story of the tug's captain is that he proceeded up the creek with the tide at a speed of about five miles per hour. When he reached a point about one thousand feet from the bridge, he blew a three blast signal indicating that he wanted the traffic cleared and the bridge opened.

This signal was heard at the bridge. The tug was not then in sight from the bridge, but came in sight when about seven or eight hundred feet away.

The preparations made by the bridge are thus described by the bridgekeeper: "I made the opening and stopped the traffic as quickly as possible, that is, shut the gates (i. e. traffic gates) off as quickly as possible and the operator after the bridge was cleared made the opening and the boat continued to come right down apparently to me from where I stood, without any hitch, just kept on coming, and before the bridge was entirely open the tug started to go through, before he had the bridge out in the center."

The operator of the bridge describes thus graphically the approach of the Wonder after she came in sight thus: "I saw him coming down. I don't know how fast it was; the tide was going out, I believe, and he kept coming and we can't shut our traffic; so I hollered to the gateman to shut off as fast as they could; this fellow kept coming and hollering, he is known as the cowboy of the Creek, anyway."

The opening of the bridge was begun as soon as the traffic was clear. The tug was then about a hundred and fifty feet away. This put her about seventy feet below the down stream abutment of the center pan of the bridge to which point the end of the bridge swung when fully open.

There is some confusion in the story of the City's witnesses as to the direction from which the tug and tow were coming. But that both sets of witnesses are talking of the same accident is shown by the log of the bridge and by the fact that the bridge operator and the captain of the tug both seem to agree that, when the tug was nearly opposite the end of the abutment of the center pan and as the bridge began to open, the captain of the tug swung her around so she headed for the Brooklyn shore to keep the tug from being hit by the bridge. As it swung, the bridge just cleared the flagstaff on the tug's stern.

Then, when the bridge was almost opened, the tug started ahead, and the Reynolds was, it is claimed, struck on her starboard quarter by one of the girders of the bridge.

The rail of the Reynolds was damaged, and she was checked in the water so that the second barge, the Mulqueen, came into her and damaged her bow.

The captain of the tug says that, in addition to the three whistles which he blew when one thousand feet away from the bridge, he blew a second three whistle blast at about eight hundred feet away, and a third signal when he was about six hundred and fifty feet away. He testified that he was going five miles an hour with the tide until he blew his second signal when he slowed to half speed, which was about two miles per hour, then stopped his engines when two hundred to two hundred and fifty feet from the center pan. He claims that it was stopping thus that caused him to lose steerage way and get his flotilla out of shape.

Whilst it is settled law that, as between the right of traffic over a drawbridge or swinging bridge crossing navigable waters of the United States and the right of navigation through those waters, the right of navigation is the paramount right, and must not be unreasonably obstructed by delay in opening the bridge, Donovan v. N. Y. Central R. Co. (D. C.) 16 F.(2d) 611, 613; Great Lakes Towing Co. v. Masaba S. S. Co. (C. C. A.) 237 F. 577, 579; Munroe et al. v. City of Chicago (C. C. A.) 194 F. 936, the rights are necessarily, to a large extent, correlative, and a vessel using the waters and desiring to pass through the bridge should not only signal in timely fashion to the bridge, but should approach it at such speed as, under the tidal and other conditions then existing, will give the bridge time to open.

In considering a case of this kind, one must bear in mind that a bridge is, of course, in its essence a fixed construction, even if it be partially mobile, as is a drawbridge or a swinging bridge like the bridge here in question. When a tug and tow come in contact with a bridge of such kind and damage occurs, the evidence must, I think, be far more persuasive than it is here to fix negligence on the operator of the bridge.

The libelant's argument, in its last analysis—leaving aside for the moment the claim that it was negligence to swing the bridge towards the on-coming tug—is that the fact that the Reynolds struck a girder under the bridge before it was wholly opened proves that the bridge did not open fast enough, and hence that there was negligence on the part of those in charge of it.

I do not think that there can be any such inference of negligence on the part of the bridge from the mere happening of the accident, and I do not think the evidence here makes out a case of delay on the part of the bridge. But, on the contrary, I think the evidence shows that whatever damage the Reynolds suffered was the result of the negligence of the tug Wonder, for I do not entirely credit the story of her captain.

The contact between the bridge and the Reynolds was, I think, due to the fact that the tug Wonder came up with the tide too fast and got too near the bridge before she checked her flotilla, then, having checked it so that it became out of shape, she had not room to straighten it out before she tried to pass through the bridge. The result was that the Reynolds was not straight in the channel, but was too near the bridge side of the channel, when the Wonder started to take her through.

The libelant claims that swinging the bridge towards the tug was negligence. I do not think so. The master of the tug himself states that this bridge is opened towards him about 50 per cent. of the time. The ambit of the swing of the bridge was measured by the end of the abutment, and was well known to the master of the tug, who was accustomed to go through it almost daily, and he should have manœuvred to have his tow so arranged as safely to pass through without damage.

To support a recovery in a case of this kind an affirmative case of negligence must be made out. City of Chicago v. Wisconsin S. S. Co. (C. C. A.) 97 F. 107, 111.

In the case just cited, which was a collision between a steamer and a swinging bridge, Mr. Justice Brown of the Supreme Court, one of the most experienced of admiralty judges, sitting in the Circuit Court of Appeals for the Seventh Circuit, said at page 111 of 97 F.: "Upon the whole case we are of opinion that, while the actual facts are by no means free from doubt, libelant has not made out its case by a preponderance of testimony. If there be any such preponderance, one way or the other, it is rather in favor of the respondent. Where fault is evident, but cannot be satisfactorily located, the libel should be dismissed. The Worthington and Davis [D. C.] 19 F. 836."

That statement fairly summarizes the situation I find here after seeing all the witnesses, and indicates the result necessary from my findings as above indicated.