**SOUTHERN RY. CO. v. WADDELL et al.**
**No. 7611.**

Circuit Court of Appeals, Fifth Circuit.
June 6, 1935.

Harry H. Smith, of Mobile, Ala., for appellant.

Harry T. Smith, of Mobile, Ala., for appellees.

Before BRYAN, FOSTER, and HUTCHESON, Circuit Judges.

BRYAN, Circuit Judge.

The Warrior Packet Line, a private contract carrier by water, accepted a shipment of cotton at Tuscaloosa, Ala., under a contract of affreightment which provided for safe delivery at Mobile. It loaded the larger portion of the cargo on a steel barge and the rest on a smaller wooden barge, and then placed both barges in tow of its river steamer, the Mamie D. In the course of the voyage, the wooden barge sank in the Tombigbee river just above the Southern Railway Company's drawbridge, which crosses that river at McDowell, with the result that some of the bales of cotton which had been loaded on it were lost and others were damaged. To recover for the damages which they thus sustained, the shippers filed a libel in personam against the Packet Line and in rem against the Mamie D, alleging that the wooden barge was unseaworthy, in that its timbers were decayed. The Packet Line, after appearing as claimant and answering the libel, vouched in, under Admiralty Rule 56 (28 USCA following section 723), the Southern Railway Company, which it alleged was responsible for the loss and damage complained of, in that it so negligently delayed the opening of the drawbridge as to prevent the flotilla from passing through without stopping, and as to render it necessary for the pilot of the tugboat, in the exercise of due caution, to land up against the bank of the river and wait there until the drawbridge should be opened; and that, in attempting to make the forced landing, the wooden barge was placed against a tree standing in the swollen water along the left river bank, and, being unable to withstand the strain thus put upon it, broke partially open, filled with water, and sank. After all the testimony was in, the shippers amended their libel so as to allege also that the Railway Company, as well as the Packet Line, was responsible for the damages claimed, on the ground that the drawbridge was not promptly opened. The trial re-

sulted in a decree for the libelants, half the damages being awarded against the Packet Line and the other half against the Railway Company; subject however to the provision that the libelants should, if unable to collect in full from either respondent, have the right over to collect the deficiency from the other.

A clear case was made out against the tugboat and its owner, since it is undisputed that the wooden barge was unseaworthy, in that its timbers were so decayed as to render it unfit to carry the load that was placed upon it. We therefore are called upon to consider only the liability of the Southern Railway Company, which alone appeals. In making up the flotilla, the steel barge was placed directly in front of the tugboat, and the forward end of the wooden barge was lashed to the middle of the steel barge on the latter's port side, so that the wooden barge extended back opposite the port side of the tugboat, but about 4½ feet away, since the steel barge was some 9 feet wider than the tugboat. The flotilla, as thus made up, was proceeding down the river, making, with the aid of the swift current, about 10 miles an hour overground, when, about 3½ miles above the drawbridge, the regulation whistle signal to open the draw was given. This signal was twice repeated before arriving at a bend on the left bank about two-thirds of a mile above the drawbridge. This bend was rounded about dusk, and the red lights on the drawbridge indicated that it was not open. But the flotilla was carried by the current as usual over toward the right bank, and, also as usual, it was necessary for the tug to back up with its tow against the current and flank over under the point so as to get in line with the east span of the draw near the left bank before the flotilla would be ready to pass through the drawbridge. The pilot testified that when he rounded the point and saw the bridge was not open he made up his mind then and there to tie up on the left bank as soon as he could get the flotilla over there from the other side of the river. He admitted that he intentionally forced the rear port side of the wooden barge against the tree, and that he did this for the purpose of tieing up to it. He did not claim that he lost control of the tug or the tow, but said that, after getting out of the swift current over toward the right bank and coming down under the point in comparatively still water, he had the flotilla under complete control. He admitted also that after passing the point he did not again look to see whether the drawbridge was open. A deck hand named Williams testified that the forward end of the wooden barge broke open before the landing was made and while the flotilla was in the middle of the river, and that he called out that the barge was sinking. Giles, another deck hand, testified that he heard Williams give such a warning, and that he made report of it to the pilot immediately after the landing was made. Giles' testimony was corroborated by the pilot, who said however that he did not hear any outcry from Williams. The engineer of the tugboat who was on duty at the time testified that before the flotilla was landed he saw the green lights on the drawbridge and knew it was open; but he did not report this information to the pilot, although he could easily have done so through the speaking tube. The chief engineer, who was off duty, and another member of the crew, also testified for the Packet Line, the one as to the manner in which the landing was made, and the other that before reaching the point the wooden barge was not leaking. Both were in a position to see whether the lights on the drawbridge had changed from red to green during the time consumed after rounding the point in the backing up and flanking over process. But neither was asked whether the drawbridge was open in time to obviate the necessity of landing and to permit the flotilla to pass through without stopping. The drawbridge was equipped with three regulation lanterns prescribed by the Secretary of Commerce, pursuant to 33 USCA § 494, to show green up and down the railroad and red up and down the river when the drawbridge was closed, and red up and down the railroad and green up and down the river when it was open. It can be opened by two men in 15 to 20 minutes, and by a larger number in less time, perhaps in 5 to 10 minutes. Its two ends are released from the fixed spans by 65 turns of the turntable, and 15 turns more are necessary to open it after it is released. Two bridge tenders had been engaged in turning the turntable for at least 10 minutes before the flotilla rounded the point. They testified that they had almost completed the 65 turns, but they admitted that the bridge had not begun to swing open until after the flotilla had been swept by the current over toward the right bank. They testified further that just about the time they had completed the 65 turns they were joined by a third bridge tender who

lent his assistance; that before the flotilla approached the left bank they had completed the final 15 turns, and that the drawbridge was wide open. In this testimony they were corroborated by a wholly disinterested witness. The district judge, who heard all the testimony, rejected, as appears from his written opinion, the testimony to the effect that the wooden barge broke open while it was in the middle of the river, and accepted the view that it did not break open until it came in contact with the tree on the left bank. Although he was of opinion that the drawbridge was open before the landing was made, and that without stopping the flotilla could have passed safely through it, he excused the pilot for landing and for not looking at the drawbridge after he rounded the point to see whether or not it was open, on the ground that the pilot acted on his best judgment in a perilous situation.

■ It is undoubtedly true that the law requires a drawbridge to be opened promptly upon reasonable signal so as to permit the passage of vessels. 33 USCA § 494. But the law, although it will not tolerate refusal or failure to comply strictly with this requirement, is not violated but is satisfied if, considering the traffic over the bridge, vessels are not unnecessarily delayed. The law does not require the drawbridge to be opened immediately upon receiving a signal to open, regardless of the distance of the vessel away from it, or the time needed to get to it. It is sufficient if the drawbridge is open by the time the vessel is ready to pass through. Escanaba & L. M. Transp. Co. v. Chicago, 107 U. S. 678, 682, 2 S. Ct. 185, 27 L. Ed. 442; The Yucatan (C. C. A.) 226 F. 437; Donovan v. New York Central R. R. Co. (D. C.) 16 F.(2d) 611; Newtown Creek Towing Co. v. City of New York (D. C.) 40 F.(2d) 649. The evidence in this case, as it seems to us, does not tend to show that there was any delay in opening the drawbridge of the Southern Railway Company. The bridge tenders had almost completed the 65 turns necessary to release the drawbridge within the 15 or 20 minutes it took the Mamie D to reach the point after giving the first signal. But assuming there was some delay, there was none which in any way caused or contributed to the sinking of the wooden barge. The bridge tenders and the crew of the tugboat all knew that at least 15 minutes would be consumed in getting the flotilla from the right to the left bank and in position to pass through the span which was nearer the left bank. Long before that maneuver was completed, according to the undisputed testimony, the drawbridge was completely open. The cause of the sinking and consequent loss of cargo was the breaking open of the wooden barge, either in the middle of the river, or on the left bank where the landing was made. If the wooden barge broke open in the middle of the river, of course no case is made against the Railway Company. Assuming that it broke open on the left bank, the landing there was unnecessary, and, under the undisputed facts, was inexcusable as well. The pilot admittedly knew when he turned the point that the bridge tenders were opening the bridge, and he knew too that at any moment they might have it completely open. It certainly was his duty to ascertain during or after the maneuver whether the bridge was open before he undertook to make a landing on the river bank. It did not occur to him that he was facing a perilous situation, and he does not even claim that he had no time or opportunity to look and see for himself. Besides, there were four members of the crew, any one of whom could have kept him advised, and one of them at least could have told him that the way was clear and that there was no need to land. There is no claim or suggestion put forward by any witness that the flotilla, after it arrived under the point, became unmanageable; on the contrary, the pilot admits he had it under his complete control and subject to his will. We are therefore unable to agree with the district judge that the landing can be explained on the theory that it was made in an emergency. In our opinion the failure to open the drawbridge more promptly neither caused nor contributed to the sinking of the wooden barge.

■ Appellees seek for the first time on this appeal to inject into the case a claim that the Railway Company should be held liable because its bridge tenders failed to display the green and red lights prescribed by the Secretary of War, pursuant to 33 USCA § 499. No such claim or theory was presented to the trial court; but aside from that, it is apparent that the pilot and crew on the Mamie D understood perfectly well that the bridge was being opened and were not misled in the slightest degree by the failure of the bridge tenders to display the regulation lights required by the War Department. Our conclusion is that

the decree should be so amended as to award full damages against the Warrior Packet Line and the tugboat Mamie D, and that as to the Southern Railway Company the libel proceedings should be dismissed.

The decree is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.