The SOUTH CAROLINA STATE HIGHWAY DEPARTMENT, Libellant,

v.

THE FORT FETTERMAN, her engines, tackle, equipment, appurtenances, etc., Libellee.

CHAS. KURZ & CO., Inc., as Owner of THE FORT FETTERMAN, Cross-Libellant.

v.

The SOUTH CAROLINA STATE HIGHWAY DEPARTMENT, Cross-Respondent.

No. 1073.

United States District Court
E. D. South Carolina,
Charleston Division.

Oct. 17, 1957.

See, also, 148 F.Supp. 620.

---

2. See Judge Frank's comments in Wallace v. United States, 2 Cir., 1949, 142 F.2d 240, at page 243.

Sinkler, Gibbs & Simons, Charleston, S. C., T. C. Callison, Atty. Gen., James S. Verner, Asst. Atty. Gen., for libellant and cross-respondent.

Waring & Brockinton, Charleston, S. C., for libellee and cross-libellant.

WYCHE, District Judge. (Sitting by Designation)

In this suit, a libel in rem by the South Carolina State Highway Department, an agency of the State of South Carolina, the Highway Department seeks damages in the sum of $250,000 against the T-2 tanker Fort Fetterman, owned by Chas. Kurz & Co., Inc., as the result of a collision between the Fort Fetterman and the Highway Department bridge across the Ashley river in Charleston harbor.

At the opening of the trial, the Highway Department moved to increase the ad damnum in its amended libel to $300,-000, but I decline to rule on this motion and reserved the same for subsequent proceedings herein, since the question to be decided by me is one of liability only.

The shipowner in its cross-libel claims damages in the amount of $175,000 for repairs, loss of use, rehandling and reshipment of cargo, etc.

During the course of the trial, at the suggestion of, and in company with, Proctors for both parties, I viewed the scene of the accident and the approaches thereto, not only from the highway bridge but also from a small yacht, in which the general course of the Fort Fetterman, from her anchorage to the bridge, was retraced. During this trip the undamaged eastern bascule arm was raised, enabling me to see the liveload block in position, the working of the bascule, as well as the working of the gear rack, during the raising process and its position after the raising of the bascule had been completed. I also examined the wreckage of the damaged bascule.

In compliance with Rule 46½ of the Admiralty Rules, 28 U.S.C.A., I find the facts specially and state separately my conclusions of law thereon, in the above suit, as follows:

### Findings of Fact

1. The South Carolina State Highway Department is a department or agency of the State of South Carolina, vested by law with the functions of constructing, maintaining and operating bridges within the State of South Carolina.

2. Chas. Kurz & Co., Inc., is a corporation organized and existing under the laws of the State of Delaware, and on October 5, 1955, was the owner of the Tank Steamer Fort Fetterman.

3. The South Carolina Legislature by an Act, approved February 14, 1918, 30 St. at Large, p. 1072, authorized the Sanitary & Drainage Commission of Charleston County to construct a bridge across the Ashley river, within the State of South Carolina. Pursuant to the provisions of a federal statute, plans for

the construction and location of the bridge were submitted to the Chief of Army Engineers and the Secretary of War, who issued an Approval Permit on May 23, 1923. The bridge was built in 1923–1925 by the Sanitary & Drainage Commission of Charleston County, and about 1925, was taken over by the South Carolina State Highway Department, which has operated and maintained the bridge ever since.

The plans for the construction of the bridge called for a 43 foot wide bridge structure with a 34 foot roadway, and showed the Ashley river at this point running in a direction, which I shall, for convenience, designate, as north and south, but with the bridge crossing the river, not at right angles in a direct east-west direction, but rather from a southeast to northwest direction on a 20° skew or angle measured clockwise to the east-west line.

4. The bridge was constructed according to the approved Permit, except as hereinafter stated. The draw portion of the bridge had two rotating pivot spans or bascule leaves operated by separate counterweights and separate electric motors housed in concrete piers or abutments on each side of the draw opening.

5. There was a guiding or protective line of piles or fenders placed along the face of the concrete abutments on each side with wings extending outward and back from the channel. There was a 110 foot clear channel running diagonally through the draw opening at an angle of 20° measured counter-clockwise from a perpendicular to the roadway centerline. There was a distance of 146 feet between the concrete abutments and an open distance of 138 feet between the line of piles or fenders along the face of the concrete abutments, leaving 4 feet inboard between each fender and each concrete pier. Each fender consisted of a single line of piles (diameter varying from 12″ to about 16″) driven into the mud and joined together with horizontal strake boards on the channel side with heavy timber on top of the piles fur-nishing a narrow walkway. South of the southern-end of the piles parelleling the pier, a cluster of 7 pilings, wrapped with cable, were located approximately 18″ westwardly of the line of the strakes on the pilings parallel to the pier. The piles along the face of the concrete abutment were not braced or battered against a blow from the channel, but the upper and lower wings of the fenders on each side fanning out from the draw opening were braced and battered. It was impossible to install more than a single line of piles along the face of the concrete pier without narrowing the channel-opening, in violation of the Permit.

6. Each bascule was comprised of two long steel girders supporting the roadway in between them. The girders were deepest in the vertical plane at the point near the trunnion or axle about which the bascule rotates. They tapered down somewhat at the tip ends where, in the closed position, each bascule was joined to the opposite one. The girders on each bascule were connected and held in their vertical plane by trussed cross frames and stiffeners under the roadway. Bearing and weight-supporting strength was provided to the girder on its upper side by a heavy steel flange in the horizontal plane and similarly fastened to its lower or under-side was another 20″ wide heavy steel flange in the same plane. In any position of the bascule the top flange was subject to tension and the bottom flange to compression. The lower flange was the thickest near its area of maximum compression, which was at the trunnion end where the gear rack was attached.

Each bascule arm was raised by two 35-horsepower electric motors assisting the gravity pull of the counterweights. These motors operated a system of gears which activated gear-wheel pinions near the foot of each girder of the bascule. These pinions engaged a quadrant gear rack on the bottom flange of each girder and as the pinions turned, the gear racks and the bascule were forced up or down, depending upon the motion imparted.

The gear rack was attached to the lower flange by heavy metal plates and numerous bolts. When the bridge was in a closed position, the two bascule tips were connected by a mechanical center lock which kept them together and made the roadway level. In this position, the trunnion ends of the girders of each bascule rested on heavy cast steel blocks attached to the bottom flange of each girder; these blocks are known as live-load blocks or shoes, and in the closed position they rested on a similar but immovable block fastened to the concrete abutment. This liveload block was about two and one-half feet above the upper-end of the gear rack on the lower flange of each girder. When the bridge was raised, the gear racks moved upward in a constant arc with the outermost point of the teeth of the rack extending about 18″ over the water beyond the face of the concrete pier but about 3½′ within and not beyond the fenders or piling along the face of the concrete pier. At the time of the collision, the point of maximum protrusion of the gear rack was about 20 feet above the water level and the top of the fender system was about 7½ feet above the water level.

7. It is agreed that the angle of elevation of each bascule at the time of the accident was approximately 71°, and it is further agreed that the Bridge Permit designated the angle of opening as approximately 80°. Since its completion the bridge has always been opened to between 71°–74°, and no complaint thereabout has ever been made by any waterfront or navigational interests. The Bridge Permit indicates that in its raised position of 80° a perpendicular dropped from the tip of each raised bascule would not fall outboard into the draw opening, between the two fender systems, but would fall on or exactly along the outboard face of the fender system. Coast & Geodetic Survey Chart No. 470 (Charleston Harbor), in effect at the time of the accident, showed for this bridge a horizontal clearance of 110′ and the skew of the bridge diagonal to the river and channel.

8. One day after the accident, the distance between the face of the fender system in front of the western concrete pier and the face of the fender system in front of the eastern concrete pier was 137.6 feet. At the same time a plumb line was dropped from the top of the eastern bascule, in the same position it was raised at the time of the accident, to determine the extent to which the top of the eastern bascule extended beyond the eastern concrete abutment and was found to be 13½′. Assuming that the western bascule was in the same position as the eastern bascule, the distance between the lines dropped from the top of each bascule to the water, would be 119′, so that at the time of the accident the top of the upstream corner of the western bascule arm overhung or extended beyond the fender piling 9′ and the top of the downstream corner 8.3′.

9. While the bridge for the past several years has been opened more than 300 times a year for other types of traffic, the transit of a vessel of this size was not common. Only four or five ships of this type and size have passed through the Ashley river bridge in the past seven years. There is no evidence of any other collisions with this bridge by any vessels passing through. As opposed to the comparatively small number of bridge openings annually for water traffic, some 30,000 vehicles use this bridge every day, it being one of the most heavily traveled, if not the most heavily traveled, sections of roadway in the State.

10. In order for a ship proceeding northwardly through the bridge to make transit through the open bascules parallel to the draw opening, it is usual for the ship to move to the left between Black Can Buoy No. C5 and the bridge. After such left turn, the ship then turns back to the right to line up with and pass straight through the opening. The Black Can Buoy is about 900 yards south of the bridge.

11. The Tank Steamer Fort Fetterman is a vessel known as a T-2 Tanker, with an overall length of 523′ 6″, a beam

of 68′ 2″, and a measurement from main deck to keel of 39′; the hull is constructed of steel; she is powered by a turbo-electric drive with a single screw; her gross tonnage is 10,457.

12. The Fort Fetterman arrived in Charleston harbor in the afternoon of October 4, 1955, and anchored in the Cooper river. At the time of arrival the vessel was drawing 15′ 6″ forward and 19′ 5″ aft. Her cargo was creosote and tar to be delivered to Koppers Company dock.

In accordance with directions of representatives of the Charleston Pilots' Association, a portion of the cargo was pumped in barges so as to lighten the vessel to a draft of not exceeding 15′, in order that she might safely make the passage up the Ashley river to Koppers Company dock.

At 3:30 a.m. on October 5, 1955, the unloading of creosote to barges was completed and the ship drew 14′ 10″ fore and aft, with the result that she had 24′ 3″ of freeboard on her hull and 6′ of her single propeller and 7′ of her rudder out of the water.

13. High tide at the Ashley river bridge on this morning was to occur at 10:37, with high slack water at or shortly before that time. This slack water stage of the tide is preferable to a flooding tide or current for transiting the Ashley river bridge in a large ship. The wind was from the east at a velocity of 16 miles per hour, and, therefore, on the starboard beam of the Fort Fetterman as she approached the Ashley river bridge.

14. Designating the river as running in a north-south direction, the bridge does not cross the same at exactly right angles, but rather on a diagonal from southeast to northwest, 20° less than a right angle, so that the channel and the current at the bridge do not run parallel to the draw opening, but on a flooding tide run at a similar 20° angle diagonally to the left of north, somewhat across the draw opening rather than straight through the same.

15. At 8:16 a.m. clocks were synchronized, steering gear and navigation equipment were examined and tested on the Fort Fetterman and all such equipment was found to be in good order; at 8:20 a.m. the tug Fort Edisto came along-side but did not tie up to the vessel; the tug proceeded on its passage up the Ashley river for the purpose of notifying the bridge to open in time for the vessel's passage and to assist the vessel in docking.

16. At 8:43 A.M. Pilot Anton Petterson and an Apprentice Pilot R. M. Burdell came aboard; at 8:55 a.m., the Fort Fetterman weighed anchor in the Cooper river in lower Charleston harbor and proceeded, under the direction of Pilot Anton Petterson, who had thirty-four years' experience as a licensed Pilot in Charleston harbor. The Master was on the bridge along with the Pilot and the Apprentice Pilot. The Master had not only the right, but was subject to the duty of relieving the Pilot and taking charge of the vessel himself the moment he thought his ship was in danger or considered the Pilot had given an improper order. The Third Mate was on the bridge near the telegraph. An experienced Helmsman was at the wheel taking directions from the Pilot. . The First Mate and the Boatswain and two hands were on the forecastle . by the anchor windlass. The First Assistant Engineer and the Second Assistant Engineer, together with an oiler and a wiper, were on watch in the Engine Room.

17. The Fort Fetterman proceeded up the Ashley river to discharge her cargo at the docks of Koppers Company, about 6½ miles from the anchorage; she proceeded about one mile southwardly in the Cooper river against the flooding tide and made a right turn to go up the Ashley river at the buoy designated on the Coast & Geodetic Chart of Charleston harbor as RBI QkFL, known as White Point Buoy. This buoy is some 5,100 yards below the Ashley river bridge and the Fort Fetterman covered this 5,100 yards in twenty-four minutes,

maintaining an average over the ground speed of about 6½ knots.

18. At no time during the approach to the bridge was any particular effort made by the Pilot or the ship's officers to determine exactly what effect, if any, the wind and tide were having on the speed or the set and drift of the vessel. No bearings on land objects were taken and her speed over the ground was not checked between available buoys or markers. No extra personnel was on duty on the bridge of the vessel, and except for an anchor detail on the forecastle, no additional precaution of any sort was taken. The movement was treated as normal and routine, although it involved the passage of a 68-foot beam vessel through a charted bridge opening of 110 feet and although the vessel in her lightened condition presented a large "Sail Area" to the beam wind, and was proceeding with a strong fair tide.

19. Prior to passing the Black Can Buoy, the Pilot and the ship's personnel were aware that the current and wind were having some effect on the handling of the ship and realized that she had to be held up somewhat into the wind, but they did not realize the full effect of wind and current, nor take sufficient steps to ascertain or allow for the same.

20. When the bridge opened, the tug Fort Edisto promptly passed through and proceeded up-river. She was well above the bridge at the time of the collision. The tug personnel in no way communicated with the Fort Fetterman at this or any other time to advise or warn her of any real or supposed delay in bridge opening or insufficiency of bridge opening or for any other purpose.

21. The ship blew the required signal for the opening of the bridge a short distance before reaching the Coast Guard Base, which is some 2,100 yards below the bridge. At this signal the bridge tender turned on the current and energized the machinery of the bridge. The bridge tender had observed the vessel approaching, as well as the tug, which had preceded the vessel at quite some distance. The ship blew again some-

where between the Coast Guard Base and the U. S. Naval Minecraft Base, which extends from a point 800 yards below the bridge to a point 1,200 yards below the starboard or City side of the channel. Promptly following this whistle signal, the bridge tender gave three blasts on the bridge siren to let the ship know that he was opening the bridge, stopped vehicular traffic on the bridge and had the bascules opened within a little more than two minutes. At the time the bridge had completed opening, the Fort Fetterman was at or a little north of Black Can Buoy No. C5, which is on the port side of the channel 900 yards below the bridge. When the bridge had completed opening the ship was in good position for her approach to the draw opening, she had steerageway, was not yawing to the one side or the other, and from the speed the ship was making, the angle of approach, everything at that time was proper to go through the bridge. The bridge had completed opening anywhere from 4 to 10 minutes prior to the entrance of the bow of the ship into the draw opening. The delay, if any, in opening the draw did not contribute to the collision.

22. During the passage of the vessel from White Point Buoy, where she commenced her run up the Ashley river, to Black Can Buoy C5, her course was in a generally northwest direction, and the east wind was therefore not directly on her beam. During this time she was proceeding directly in line with the flooding current. However, at or shortly after the time she passed Black Can Buoy C5, she veered or dropped off to the left or leeward so as to get into position to come to her right and line herself up with the draw opening, which is on a 20° angle to the channel and river. When she made this last movement to the right, it not only presented her beam almost directly to the east wind, but it also put the force of the current at a 20° angle on her starboard quarter rather than directly astern as it had been. This last turn to line up for the approach greatly accentuated the adverse effect of both

wind and tide on the handling of the vessel, and it was the failure to anticipate and made allowance for the same that caused her faulty approach.

23. The force of the wind acting on the approximately 15,000 square feet of sail area of the vessel, together with the substantial current also setting her to leeward, were not sufficiently provided against by the Pilot and the ship's officers, and the left turn to line up with the draw opening was accelerated by wind and current and had the effect of putting the vessel considerably down to leeward from the draw opening so that she had to be given a full right rudder and her speed increased progressively from "Slow Ahead" to "Full Ahead" in an effort to make her answer the right rudder and get her back up to windward in position to enter the draw opening. As she neared the draw opening under a "Full Ahead" bell, her bow had come up somewhat and got into and through the draw opening, but her stern was too far down to leeward and she crabbed into the southwest corner of the fender system and bridge structure, hitting the same with a combination forward and sideway movement. Her approach to the draw opening from the leeward side, was in violation of the time-honored rule requiring mariners to "Keep off the lee shore". Her speed at this time was not less than five knots over the ground and was probably considerably more, since she outran an outboard motor boat making 8–9 knots and trying to get ahead of her to enable a photographer to take photographs of her transit. At 9:39 a.m., according to the ship's clock (9:41 a.m. according to the bridge operator's clock), the port side of the ship collided with the west side of the bridge. The downstream girder of the western bascule was first destroyed with the result that the downstream portion of the bascule reached the water first. No contact was made between the starboard side of the ship and any part of the bridge, fenders or bascule on the eastern side of the draw opening.

24. Arrangements made between the ship's local agent and the local Pilots' Association contemplated that the vessel should get underway at such time on this morning as to reach the Ashley river bridge at or shortly before high slack water, but the ship reached the draw opening and struck the bridge almost one hour ahead of high water, and while the tide was still flooding with considerable velocity, approximately 2 knots. From her anchorage to the bridge is a distance of some three and one-half miles, which she covered in forty-one minutes.

25. At the time of the first contact between vessel and fender system, prior to the contact between vessel's superstructure and bascule, there was a definite and severe shaking and vibration of the bridge structure for varying distances back toward the shore. The first contact between vessel and bridge structure occurred before the ship's superstructure had entered the draw opening, and was on the port side of the hull of the tanker at a point along her forward flush deck about opposite her foremast but a few feet below the main deck line; the first contact was about 135 feet aft from the stem and about 40 feet forward of fashion plate and superstructure, and this first contact was with the gear rack on the downstream girder of the western bascule. The downstream corner or edge of the top six or seven teeth sustained a severe blow. The gear rack was broken and bent in an upstream direction, together with the plates securing it to the lower flange of the downstream girder; some 15 bolts, almost 1″ thick, which held the cover plates together on either side of the rack were sheared and popped, and the liveload block on this girder, held in place by four 1¼″ bolts, was sheared off and fell on the concrete abutment. A fixed bridge navigation light extending about 3 feet outward from the abutment on this corner and located downstream from and a little below the point of maximum gear rack protrusion, was broken and bent

in an upstream direction. The fender piles, strakes and walkway timbers were crushed and shredded at the point of contact. The impact rammed the fender system back against the concrete abutment more than three feet out of position.

There was no damage to the vessel between the point of first contact and the beginning of her fashion plate and forward superstructure which was a distance of some 40 feet aft. There was damage on the port fashion plate which is the curved metal section leading upward from the main deck to the first superstructure deck and which is, in effect, a continuation of the hull upward at this point to form the outboard skin of the superstructure. There was damage to other higher portions of the superstrucure of the vessel at or near the forward corner of her superstructure on the port side.

26. There was no sudden sheer of the vessel into the west side of the bridge structure. The blow of the hull of the ship against the gear rack on the downstream girder twisted that girder and its lower flange out of the plane in which they were designed to bear weight and stress so that the compression on the flange was lost and the natural force of gravity caused the downstream side of the bascule immediately to droop, sag and fall from its 71° elevation, before the vessel's fashion plate and forward superstructure had entered the draw opening. During that time the vessel, still under forward momentum, rebounded, glanced off or sprung away to her right from the abutment and fenders so that in the few seconds that it took for her fashion plate and superstructure to progress forward to a point opposite the downstream girder, she was no longer in contact with the fender system and was back in the clear opening between fenders. During these same few seconds, the downstream girder fell several degrees, so that it dropped on or directly in the path of the vessel's fashion plate and superstructure.

If the vessel were immediately contiguous and parallel to the fender piles in their normal position, the bascule would have to be down to an elevation of approximately 55°-60° in order to make contact with the vessel's fashion plate; if the vessel were farther away from the fender system, the bascule would have to be at an even lower elevation. The entire curve of the fashion plate was damaged in the collision and the only instrumentality which could have damaged it was the downstream girder. When the fashion plate came opposite the girder, the ship had moved out after first contact and the girder had fallen several degrees between the time of first contact between hull and gear teeth and the time of second contact between girder and fashion plate.

The condition of the lower flange of the downstream girder establishes that the 20-inch wide flange had been twisted and knocked from its accustomed plane by a blow. There are two lines of rivets on both the upstream and downstream side of the lower flange. These are only a few inches apart. Many rivets on the downstream side just above the liveload block were severely scored or abraded. Rivets on the upstream side remained untouched.

With the bridge at 71° elevation, if the vessel had proceeded through parallel and immediately contiguous to the west fender line, the highest tip of her superstructure on the port side would have come in contact with the uppermost point on the raised bascule, but this fault on the part of the bridge never became an operative factor in this collision since the effective damage had already been done by the blow from the hull of the ship 40 feet ahead of the superstructure. The damage that might have been done by the bascule striking such small tip of the vessel's superstructure would have been speculative and negligible.

27. The gear rack moves in a constant arc as the bascule is elevated and would have been in the same position and struck by the ship if the elevation of

the bridge had been anywhere between approximately 50° and 89°.

28. The use of the tug or tugs to control the vessel on her approach and to present her at the draw opening ready for making the transit would have been prudent, proper and advisable under wind and tide conditions such as existed on the occasion of this accident.

29. There were no mechanical breakdowns on the ship and all orders from those in charge of the ship were promptly carried out during the period preceding the collision.

30. This accident could have been avoided had those in charge of the vessel waited for slack high water, had they followed proper navigational practice in allowing for wind effect, or had they used the available tug to assist them in making a proper entrance into the draw opening.

31. There was no delay in opening the bridge for the passage of the Fort Fetterman such as to interfere in any way with her navigation. The draw appeared generally to be as wide open to the Pilot as he had ever seen it.

### Conclusions of Law

1. The subject matter of this suit is a collision between an ocean-going vessel and a bridge constructed across a navigable stream of the United States within the Eastern District of South Carolina; this Court has jurisdiction of the parties and the subject matter in this suit.

2. It is true that the law requires a drawbridge to be opened promptly upon reasonable signal so as to permit the passage of ships (33 U.S.C.A. § 494), but this law is complied with if, considering the traffic over the bridge, vessels are not unnecessarily delayed; the law does not require the drawbridge to be opened immediately upon receiving a signal to open regardless of the distance of the vessel away from it or the time needed to get to it; it is sufficient if the drawbridge is opened by the time the vessel is ready to pass through. Southern Ry. Co. v. Waddell, 5 Cir., 77 F.2d 903.

3. Unrestricted navigation of the rivers is of utmost importance to the vessels, while unimpeded passage across the bridges is of utmost importance to pedestrians and vehicular traffic; the rights of each class are to be enjoyed without invasion of the equal rights of others. Some concession must be made on every side for the convenience and the harmonious pursuits of the different occupations. Escanaba & L. M. Transp. Co. v. Chicago, 107 U.S. 678, 2 S.Ct. 185, 27 L.Ed. 442.

4. Deviation from the approved permit should not be considered unless such deviation was the proximate cause of, or contributed to the collision and damages. The test in this case is whether such deviation was the proximate cause of or contributed to the collision. Savannah & N. Y. Transp. Co. v. Klaren Bridge Co., 4 Cir., 252 F. 499. The forcible blow of the ship's hull on the downstream gear rack on the west bascule which caused the bascule to drop on or into the path of the fashion plate and superstructure of the vessel was the result of faulty navigation and negligent seamanship of those in charge of the vessel and this blow would have been sustained whether the bridge had been elevated 51°, 61°, 71°, 81° or higher, and such negligence was the sole and only effective proximate cause of the damage to both ship and bridge. Having reached this conclusion it is not necessary for me to decide whether or not thirty years' continued use without accident or complaint would imply approval of the deviation from the approved permit.

5. Bridge fender systems should not be expected to withstand an impact greater than the usual or ordinary impact of the vessel going through the draw; ships of the size of the Fort Fetterman were very infrequent users of the bridge and a power-packed solid blow from a 10,000 ton ship making 5 knots or more, under a "Full Speed Ahead" bell, is not reasonably to be anticipated as the ordinary and usual type of force that this fender system should be able to withstand. The fender

system may have cushioned and absorbed the impact so as to have prevented destruction of the concrete abutment and part of the roadway on the west side of the draw where many vehicles were waiting, and to that extent it may have served its purpose.

6. The sole and proximate cause of the collision between the Fort Fetterman and the highway bridge and the damages arising therefrom was the negligent navigation of the Fort Fetterman (a) in attempting to proceed through a charted 110 foot draw opening with a 68 foot beam vessel showing 24 feet of hull freeboard plus superstructure at a time when there was a beam wind of 16 miles per hour and a quartering tide of about 2 knots setting 20° leeward of the course through the draw; (b) in failing to take any added or extra precautions for handling the vessel under the adverse conditions of wind, tide and freeboard; (c) in failing to await slack high water for making the transit; (d) in failing to make use of a tug or tugs to assist her in making the passage through the draw; (e) in failing to maintain control of the vessel as she approached the draw opening and allowing her to fall off to leeward so that she crashed and crabbed diagonally into the southwest corner of the fender system and bridge structure; (f) in failing to ascertain wind and tide effect on the vessel and in underestimating or misjudging the force and effect of the adverse wind and current.

7. There was no negligence on the part of the Highway Department or those in charge of the operation of the bridge that caused the collision which resulted in damages to the bridge and to the vessel; the construction, maintenance and operation of the bridge in no way contributed to the collision or the damages resulting therefrom.

### Decree

It is further ordered, adjudged and decreed, that the Libellant The South Carolina State Highway Department recover of and from the Libellee Chas. Kurz & Co., Inc., the full amount of damages sustained by the Libellant by reason of the matters and things alleged in the Libel, together with costs of this suit; the damages sustained to be hereafter determined by further proceedings; and

It is furthr ordered, adjudged and decreed, that the cross-libel be and the same is hereby dismissed, and that the question of Libellant's entitlement to interest on the sums already expended by it for temporary bridge repairs and otherwise be reserved for the further order of this Court.