SOUTH CAROLINA STATE HIGHWAY DEPARTMENT, Libellant,

v.

THE Tank Steamer FORT FETTERMAN, her engines, tackle, equipment, appurtenances, etc., Libellee.

CHAS. KURZ & CO., INC., as owner of The Tank Steamer Fort Fetterman, Cross-Libellant,

v.

SOUTH CAROLINA STATE HIGHWAY DEPARTMENT, Cross-Respondent.

No. 1073.

United States District Court E. D. South Carolina, Charleston Division.

Sept. 26, 1959.

Sinkler, Gibbs & Simons, Charleston, S. C., James S. Verner, Asst. Atty. Gen., for libellant and cross-respondent.

Waring & Brockinton, Charleston, S. C., for libellee and cross-libellant.

WYCHE, District Judge.

On June 8, 1959, the Court of Appeals remanded this case to the District Court for further proceedings (4 Cir., 268 F.2d 27, 1959 A.M.C. 1342). The scope of the remand was limited to consideration of the following questions: 1. With respect to the gear rack used to elevate the bascule span, was its protrusion approximately 18 inches beyond the face of its concrete pier housing, but some 3½ feet shoreward of the channel face of the protective fender line, a violation of the permit issued by the War Department for the construction of the Ashley River Bridge? 2. Was it reasonably possible that the failure to raise the bascule leaves more than approximately 71° could have caused or contributed to the collision and damage resulting from the ship's impact against the bridge structure? 3. Was it reasonably possible that any other statutory violation on the part of the libellant could have caused or contributed to the destruction of the bascule?

Opinion.

In my findings on the first trial of this case I described the location, basic construction and mechanical operation of this bridge and its appurtenances.[1]

I have considered all proffered testimony and exhibits that were offered both at the prior trial and at this trial.

There are three statutes that cover the procedure followed by the War Department in authorizing bridges over navigable streams.[2] While these vary somewhat among themselves, the War Department, which is the agency charged with the administration of these laws, follows substantially the identical practice in administering them.

There is now an official pamphlet describing the procedure to be followed by any agency desiring to erect an obstruction to navigable waters; a portion of this pamphlet is devoted specifically to bridges. At the time the permit for the Ashley River Bridge was sought, the then-existing pamphlet did not contain a section specifically applicable to bridges, but rather made reference to detailed instructions on the bridge application form itself. Such a form was used in connection with the Ashley River Bridge application and a copy of the same, from the Office of the Chief of Engineers, Washington, is in evidence. It is clear that the "plans" accompanying the application are not of the detailed type required for con-

---

1. See, D.C., 155 F.Supp. 359, 1958 A.M.C. 1735. Findings of Fact Nos. 3–6, inclusive.

2. 33 U.S.C.A. § 401; 33 U.S.C.A. § 491; 33 U.S.C.A. § 525.

struction bids, and have no similarity to the meticulous detail of the so-called "shop drawings" or working plans used to fabricate and erect the bridge itself. The testimony of Robert J. Kennedy, Chief, Miscellaneous Civil Branch, Civil Works, Office of Chief of Engineers, U. S. Army Engineers, Washington, shows that in the many years throughout which he has handled all such applications, the only "plans" presented to the War Department were sketches of the sort accompanying the Ashley River Bridge application. It would be most extravagant to expend the builder's funds for costly detailed construction plans and drawings before the builder is virtually assured of the approval of its application by the War Department.

As a general rule, it is only after a permit application has been approved that detailed contract drawings for the structure are prepared and these form the basis for bidding on the construction contract. Those to whom is delegated the work of preparing the contract drawings are required to make certain that those drawings faithfully implement the conditions of the permit, and afford its prescribed navigational clearance. After the job has been awarded, the successful bidder is required to prepare detailed shop drawings. On these drawings the location and size of each hole, spacing, plate and angle are set forth in precise measurements, in order that the work can be fabricated in the manner contemplated by the contract plans and the structure erected on its chosen site. Here again the shop drawings must obey all conditions of the permit and provide its prescribed navigational clearance.

War Department regulations, then as well as now, merely required that the "plans" accompanying the permit application show only those structural details which are needed to illustrate the effect of the proposed structure on navigation. The Ashley River Bridge application form specifically stated to the applicant that "the omission of all other details is generally desirable". The most important feature of any permissible naviga-

tional obstruction is the clearance of the opening through the same; this opening constitutes the navigational fairway. The Ashley River Bridge application form provided that the sketch plan submitted therewith must show, among other things, "the outside structure lines separating the area left for navigation from the area occupied by the bridge * * *." The current regulations require particularly that the clearances of the navigational opening be outlined in red on the permit application, a procedure which had been followed in this application.

The processing of every application starts at the District Engineer's level, where it is not unusual for the applicant and the District Engineer personnel to have informal talks to acquaint the applicant generally with what will be approved by the District Engineer. After the application is filed, notices of the same are sent by the District Engineer to all interested parties, and in some cases public hearings are held. A record is made of the proceedings by the District Engineer and it is sent to the Division Engineer and to the Chief of Engineers in Washington, with the recommendations of the District and Division Engineers. In Washington, it is reviewed by trained civilian personnel and if approved by them is processed routinely for the signature of the Secretary of War or his deputy. At this stage the approved permit is issued.

The work of the Army Engineers does not end there. It is their duty to see that the conditions of the permit are observed in the construction and maintenance of the bridge. Liaison of the most cooperative nature is maintained between the Army Engineers and those who build structures over navigable waters. Periodic inspections are made in order to avoid costly mistakes and to insure that the conditions of the permit are observed. During these inspections resort can be had to the detailed working plans on the job site. Thus all those who are charged with the determination of whether the structure is built in accordance with the

conditions of the permit have full opportunity to determine if the plans as drawn faithfully implement the conditions of the permit.

This general course of action was evidently followed in the case of the Ashley River Bridge. At the time of its construction the project was one of the most important highway bridges on the Atlantic Coast, and had been much publicized both at the local and regional levels.

During the greater part of this time the Army Engineers' office in Charleston, was under the command of Colonel Jadwin, who filled the billets of both District and Division Engineer, and who was later Chief of the Army Engineers in Washington.

As early as 1922, conferences on the subject of the bridge had occurred between State officials and Army Engineer officials in Charleston. On May 17, 1922, a public hearing was held at the District Engineer's office in Charleston. As a result of this hearing some rearrangement of the proposed structure was effected. For reasons of symmetry, the State agencies had proposed that the draw be located in midstream position, but in deference to the objections of the local pilots, this position was altered. As pointed out in Finding of Fact No. 14 in my previous decision, the bridge does not cross the channel at right angles, but rather on a diagonal from southeast to northwest, 20° less than right angle, so that the channel and the current at the bridge do not run parallel to the draw opening, but on a flooding tide run at a similar 20° angle diagonally to the west (left) of north.

The Sanitary and Drainage Commission for Charleston County, the State agency chosen by the South Carolina Legislature to promote or sponsor the bridge, employed James L. Parker, a consulting engineer of broad experience, to design all parts of the bridge with the exception of the bascule spans. The arrangements here were effected through the functioning of the State Highway Department, which was the agency in charge of the project.

Early in 1923, negotiations were entered into with the Strauss Bascule Bridge Company to design the bascule spans. That company was outstanding in its field and had patented a design which was widely known as the "Strauss bascule". The record established that this company had at that time designed more bascule bridges, numbering in the hundreds, than any other engineering company. These bridges were located all over the world, although the majority were in this country. The design of all was basically similar.

The sketch plans accompanying the permit were actually drawn by the witness Roberts, who was the resident engineer in charge of the bridge. All concerned with the prosecution of the project were satisfied that the application presented to the District Engineer in Charleston, in the spring of 1923, would receive speedy approval; in the meantime, work had been under way on the detailed contract drawings. This work was done under the supervision of the witness Barstow, who at that time had the position and title of Assistant Squad Boss in the Strauss Company. Much of the work of drawing the bascule plans, and of supervising others who were drawing the plans, was done by Barstow. Barstow stated that the contract drawings were intended to, and, in his opinion did, faithfully implement the permit. He testified further that the shop drawings which were intended to implement in detail the contract drawings, performed that function.

Concrete piers parallel to and adjacent to each other were located 146 feet apart, in order that the basic condition of the permit be observed, viz., that the least clear width of opening at right angles to the axis of the skewed channel measure 110 feet. A fender system, consisting of a single line of creosote-treated piles, was located in front of each concrete pier so there would remain open water, constituting the navigational fairway, of 138 feet. The bascule arms were designed by the Strauss Company to be raised to approximately 80°. At such angle of eleva-

tion, the integrity of the 110-foot channel would be maintained, even though the tip of the bascule would extend slightly over the channelward face of the fenders.[3]

The liaison between the Army Engineers' office and the State Agencies continued all through the construction period. The shop drawings were on the job site and available for inspection. I am satisfied that the Army Engineers knew the detailed design of the bridge. Those in charge regarded the construction itself as a faithful implementation of the plans which accompanied the application.

It appears from the testimony of the witness Kennedy, who, to all intents and purposes, acts for the Chief of Engineers and the Secretary of War in Washington, as well as from the testimony of the witnesses Conway and Candrick, who, to all intents and purposes, act for the District Engineer at the local level, that machinery and structural details outside and shoreward of the navigational opening or clearance shown on the permit sketch do not concern the officials responsible for passing upon bridge applications. Similar testimony from the ship's witness Smart, and from the Highway Department's witness Gooding, was presented at the first trial in this matter, more than two years ago, viz., the clear opening through the permitted obstruction was the principal and primary concern of the Army Engineers. This interpretation of the statute and of the instructions to applicants promulgated pursuant to the statute has been followed and applied at both the local and national levels for many decades.

■ It is true, of course, that as to written documents (in this case the application, the sketches and the permit) the court is the final arbiter of their meaning. This rule also applies to regulations promulgated pursuant to law, but under these circumstances the settled interpretation of the agency charged with the administration of the law carries great weight. Particularly is this true where such interpretation is of long standing and has been accepted by those who must operate in compliance therewith. Certainly courts should hesitate to adopt a construction of the meaning of a regulation in direct conflict with the considered opinion of a specialist who must administer the law pursuant to which the regulation is promulgated. United States v. Chicago, N. S. & M. R. Co., 1933, 288 U.S. 1, 53 S.Ct. 245, 77 L. Ed. 583; C. I. R. v. Sternberger's Estate, 1955, 348 U.S. 187, 75 S.Ct. 229, 99 L.Ed. 246. Good administration of a regulatory statute and good judicial administration alike require that the standards for public enforcement and those for determining private rights should not be at variance unless justified by very good reasons. Skidmore v. Swift & Co., 1944, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124.

In order to answer the question of whether the design of the bascule violated the permit because of the so-called protrusion of the gear rack when the bascule was raised, it is first necessary to determine whether it was necessary that the position of the gear rack be shown on the sketch plans which accompanied the application for the permit.

3. To reach a point where a line projected downward from the tip of the raised bascule would rest against the channelward face of the fender system, the bascule must be raised to an angle of 82°. Such angle is computable from the specifically stated dimensions appearing on the "plans" accompanying the application for the permit, but the measurement of this angle is not specified on these plans. Had it been intended that this angle should control the drawing, then the accuracy of all stated dimensions would be completely destroyed. For example, the distance between the two piers would have to be extended beyond 146 feet, and obviously the length of the bascule arms would have to be extended in order to avoid a hiatus in the roadway. Similarly the width of the skewed channel would have exceeded 115 feet. Since the measurement of the angle is not given, but the dimensions are, it is clear that if the situation here be regarded as ambiguous, the stated dimensions must control. It is likely that the angle was merely illustrative.

The instructions on the application control the type of drawings to be set forth on the sketch plans, and constitute the criteria which the applicant for the permit here had to follow. The instructions require: "(a) A map showing the proposed location, and the waterway for the distance of 1 mile above and below, with the data in regard to low and high water, direction and strength of currents, soundings, existing bridges in the vicinity, etc., necessary to enable the Chief of Engineers and the Secretary of War to determine whether the location is a proper one. (b) Plan of the bridge showing the length and height of spans, width of draw openings, position of piers, abutments, fenders, etc., and those features which affect navigation, giving on both horizontal sections and elevations the outside structure lines separating the area left for navigation from the area occupied by the bridge, and, in figures, the least clear width of openings at right angles to the axis of the channel, and the least clear heights with reference to high water, ordinary boting water, and low water. (c) The essential features of the draw in two positions, closed and fully open."

The printed instructions constituting a part of the application refer the applicant to the foregoing general description in connection with the preparation of drawings; in connection with the "structural details" to be shown on said drawings, the instructions provide: "Only those should be shown which are needed to illustrate the effect of the proposed structure on navigation. The omission of all other details is generally preferable." [4]

Those who process drawbridge applications examine the sketch plans accompanying such applications to determine if the bridge will insure reasonable width and height for the passage of vessels. They are principally concerned with what the witness Kennedy described as the "clear width" or "navigation opening" between fenders. Certainly it cannot be held that the instructions affirmatively required the applicant here to show the existence of any structural details outside the area for navigation unless such structural details would have an effect on navigation. I take this to mean the effect upon vessels navigating with reasonable care and prudence. As the witness Conway stated, the applicant is not required to consider all possible eventualities or remote possibilities. Nor are the Army Engineers supposed to perform the function of consulting or supervising architects in matters of bridge construction. Their sole purpose and obligation is to pass upon the plans for obstructions to navigable streams, in determining their effect from the standpoint of navigation. Freeport Texas Co. v. Houston, etc., R. Co., D.C.S.D.Tex. 1919, 257 F. 213.

There was a direct conflict in the testimony of the witnesses presented by the parties as to whether the position of the gear rack would reasonably have been expected to have an effect on navigation, and therefore as to whether it should be shown on the sketch plans.

Witnesses for the Highway Department indicated that in their opinions the position of the gear rack could not reasonably have been expected to affect proper navigation and therefore need not have been set forth on the permit plans. They based their opinions upon the fact that the designed location of the gear rack placed it not less than 30 inches shoreward of the fender face.[5]

---

4. The similarity between these instructions and the pamphlet now in use is noteworthy.

5. During the course of the years the position of the fender system had been slightly changed, so that on the occasion of the collision it was located 42 inches away from the gear rack. The witness Barstow maintained that there was no "pro-

trusion" of the gear rack. He pointed out that many piers had no side walls to protect the machinery of the bascules from weather or water, and it was only because of the "pit" design of the pier here that the protrusion came about. Had a different type of pier been employed (as was the case in many other bridges) the bascule leaf would have been

After a careful consideration of all the evidence, it is my opinion that the clear weight and preponderance of the evidence upholds the contention of the Highway Department on this point.

Careful consideration of all of the evidence on this subject results in my considered conclusion that there was no reasonable possibility that the location of the gear rack could affect properly navigated vessels.

The fact that the blow to the gear rack resulted in the destruction of the bascule does not alter my opinion. The force of the negligently-operated vessel was so tremendous that great damage must inevitably have followed any contact made by it. The Fort Fetterman was proceeding at Full Speed Ahead, and was, to all intents and purposes, out of control. The action which was taken to diminish her speed occurred after, and not before, contact with the bridge took place.

On the basis of this evidence I have concluded that the position of the gear rack did not have to be shown on the plans accompanying the permit application. I have determined that both the contract plans and the shop drawings faithfully implement the plans accompanying the permit application. I have also concluded that the bridge was constructed in strict obedience to the shop drawings. I find that the bridge itself was constructed in accordance with the permission granted by the Army Engineers, and since the bridge was a lawful structure, the so-called protrusion of the gear racks was not a violation of the permit.

The testimony on the second question is also in conflict. The witness Gooding, the witness Barstow, and the witness McCrady each testified that in his opinion there was no reasonable possibility that the destruction of the bascule which occurred at an angle of elevation of 71° would not have occurred had the bridge been elevated to an angle of 80° or 82°.

The witness Grushky and the witness Collard were of different opinions. Here again the question is one of credibility. My decision for the libellant is based upon the clear and convincing reasoning of the witnesses. Libellant's evidence on this question pointed out that had the bridge been raised to a higher angle, the point of contact would have been at a position on the gear rack which would have offered less resistance than the point at which contact did take place at an elevation of 71°. At an angle of elevation of 80° or 82° the impact would have been a foot or more further away from and below the cross-frame or stiffener running between the two bascule girders at the position of the live-load shoes. The resistance of the raised girder to torsion or horizontal force becomes progressively less as the distance from the cross-frame or stiffener increases, and it is therefore plain that the likelihood of the blow collapsing the bridge at an elevation of 80° or 82° would be certainly as much and probably greater than it was at 71°.

Eye-witness and expert engineering testimony at the first trial, convinced me that the first blow of the hull of the Fort Fetterman against the gear rack and girder caused the west bascule to fall on or in front of the ship's superstructure, thereby effectively destroying the bridge and inevitably producing the damage to both bridge and vessel. Not only has there been nothing developed at the remand hearing to weaken this finding, but on the other hand, the same has been strengthened in this regard by additional expert testimony. I find, therefore, that on this point the libellant has met the burden imposed by the Pennsylvania Rule.

The only other possible statutory violation was that resulting from the change of position of the fender system protecting the western pier. Originally it had been intended that this fender system be located only 2½ feet channelward of the

completely exposed, with the result that no protrusion would have occurred in

the lifting process, for there would have been nothing to protrude from.

plane in which the gear rack would lie when the bascule was raised. Evidently in the course of the maintenance of the fender throughout the years, this position had been changed, so that on the occasion of the collision it was located 3½ feet channelward of that plane. The testimony on this point convinced me that there was no reasonable possibility that the variance here could have caused or contributed to the result. Again the libellant has met the burden of the Pennsylvania Rule.

The protective fender system comprised a single line of piles of diameters varying from 12 inches to about 16 inches, driven into the mud and joined together horizontally with strake boards on the channel side and heavy timber on top. Those piles which were placed along the face of the concrete abutment were not braced or battered on the shoreward side, and because of a protruding ledge or shelf of the concrete abutment far down in the mud, no more than a single line of piles could be placed. The design and location of the fender system here was standard for this type of bridge. The colliding momentum and mass of the Fort Fetterman rammed the fender system up against the concrete abutment, substantially compressing, crushing and shredding some of its piles, leaving creosote stains on the abutment. The blow caused a definite and severe shaking and vibration of the entire bridge structure for varying distances back toward the shore and broke off a section of the gear rack, bending its cover plate, popping some 15 bolts almost one inch thick, and knocking off the live-load block which was held in place by four 1¼-inch bolts. I have already found, and now reiterate, that this type of impact is not reasonably to be anticipated or fended off by a proper and adequate fender system; the fenders and dolphins in place were in reasonably good condition and able to perform their functions against any reasonable impact, but the force of this collision far exceeded any normal or ordinary impact foreseeable for such a fender system, and was, to all intents and purposes, impossible to guard against.

It was never contended that any deviation had been sought from the permit as originally granted. However, the memorandum of June 5, 1956, as well as the report from the District Engineer to the Chief of Army Engineers that the bridge had been completed in accordance with the conditions and plans approved by the Chief of Engineers May 21, 1923, and by the Assistant Secretary of War, May 23, 1923, were offered and accepted as evidence that those in charge of supervising the work approved the contract drawings, and the shop drawings, and the construction itself, as faithful implementation of the permit which had been issued by the Secretary of War. The presumption that a public officer does his duty is strong in a case of this sort, when the public officers involved are dead and the work which they did is over three decades old. Shafer v. United States, 4 Cir., 1956, 229 F.2d 124, certiorari denied 351 U.S. 931, 76 S.Ct. 788, 100 L.Ed. 1460. There is a presumption of regularity which supports the official acts of public officers. United States v. Zuskar, 7 Cir., 1956, 237 F.2d 528, certiorari denied Budzileni v. United States, 352 U.S. 1004, 77 S.Ct. 564, 1 L.Ed.2d 549. These documents are part of the evidence that those in charge of this work considered: (1) that the sketch plans accompanying the permit application set forth everything that was required; (2) that the contract drawings and the working shop drawings properly implemented the sketch plans accompanying the permit application; and (3) that the location of the gear rack did not have to be shown on the said sketch plans and its existence was not a violation of the permit.

### Findings of Fact.

The greater weight and preponderance of the evidence require the following findings of fact:

1. The bridge across the Ashley River, erected by the Sanitary and Drainage

Commission of Charleston County and the South Carolina State Highway Department, was properly constructed in accordance with the permit granted by the Secretary of War of the United States.

2. It is not unusual in the construction and operation of bascule lift drawbridges that they present toward the draw opening a lift gear rack protrusion, and many bridges now and formerly in existence have been erected with such a protrusion; however, as in this case, such protrusions do not extend channelward of the fender line or into the area reserved for navigation.

3. The gear rack location and its protrusion were not and are not features of the bridge affecting navigation, and their existence and operation did not and do not constitute a violation of the permit, and the same were not and are not required to be shown on the permit drawings or sketches submitted to and approved by the War Department. The protrusion did not extend channelward of the fender line, but was 2½ feet or more shoreward of the same.

4. The first blow of the hull of the Fort Fetterman against the gear rack and girder in question effectively destroyed the bridge and inevitably produced the damage thereto.

5. The gear rack moves in a constant arc and beyond a bridge elevation of about 50° would have presented the same amount of protrusion at any bascule elevation up to the limits of opening; had the bridge been elevated to 80° or 82° at the time of this accident, instead of 71° as it was, the amount of gear rack protrusion would have been the same, but the impact of the vessel would have been against a different section of the gear rack, about a foot or so below the actual point of contact. Thus, at 80° or 82° elevation, the blow of the ship would have struck a portion of the gear rack further. away from the cross-frame or stiffener which joins the downstream girder to the upstream girder at the point of the live-load shoe. The resistance of the girder and gear rack to torsion and horizontally-applied force progressively decreases as the distance from this cross-frame or stiffener increases, and, therefore, the likelihood of collapse of the bridge would be greater at the higher elevation. In any event, the fact that the bridge was elevated to 71° instead of 80° or 82° could not with any reasonable possibility have caused or contributed to the collision or to the damages resulting therefrom. These damages would have been sustained whether the bridge had been elevated 61°, 71°, 80°, or 82°.

6. The only other statutory violation in the case is that claimed to result from the location of the fender system on the west side of the draw, about one foot further channelward than the permit indicates the same to be. However, the evidence on this point readily convinced me that there was no reasonable possibility that this variance could have caused or contributed to the collision and consequent damage. There is no reasonable possibility that any other statutory violation in the construction, maintenance or operation of the bridge could have caused or contributed to the collision and the damages resulting therefrom.

7. There was no negligence on the part of the Highway Department or those in charge of the operation of the bridge or its fenders that caused, contributed to, or could have possibly caused or contributed to the collision resulting in the damages to this bridge and the vessel; any fault in the construction, maintenance and operation of the bridge and its fenders did not contribute to, and could not possibly have contributed to the collision or the damages resulting therefrom.

### Conclusions of Law.

■ 1. Under the statute governing the application for, and issuance of the permit for the building of the Ashley River Bridge in Charleston Harbor in 1923, it was not required that the gear rack or its protrusion be shown on the

permit drawings. Its existence when not so shown was not a violation of the permit, since the gear rack was not an essential feature of the draw span structure with respect to the navigational opening, and was a structural detail of the bridge which had no effect on navigation.

2. The State Highway Department was guilty of a statutory fault, at the time of this accident, in that the bascule arms were not raised sufficiently high to provide the clear channel opening required by the War Department permit; however, as found hereinabove, this statutory fault could not, with reasonable possibility, have caused or contributed to the collision and the damages consequent thereupon.

3. The libellant has fully met the test of the Pennsylvania Rule and has overcome the admittedly heavy burden of establishing that its statutory fault could not have, under the reasonable possibility test, caused or contributed to the accident and resulting damages.

4. The sole possible and only proximate cause of the collision between the Fort Fetterman and the Highway Department Bridge and the damages arising therefrom, was the negligent navigation of the vessel in the particulars mentioned in my earlier decision in this case (see, Conclusion of Law No. 6, 155 F.Supp. 359, 368, 1958 A.M.C. 1735, 1748) and there is no reason for a division of damages in this cause.

### Decree.

It is ordered, adjudged and decreed, That the libellant the South Carolina State Highway Department recover of and from the libellee Chas. Kurz Co., Inc., the full amount of damages sustained by the libellant by reason of the matters and things alleged in the Amended Libel, together with costs of this suit; the amount of damages sustained to be hereafter determined by further proceedings.