**THE Tank Steamer FORT FETTERMAN, Libellee, and Chas. Kurz & Co., Inc., Cross-Libellant, Appellants,**

v.

**SOUTH CAROLINA STATE HIGHWAY DEPARTMENT, Libellant and Cross-Respondent, Appellee.**

No. 8023.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 22, 1960.

Decided May 19, 1960.

Charles W. Waring, Charleston, S. C. (Waring & Brockinton, Charleston, S. C., on brief), for appellants.

Charles H. Gibbs and Huger Sinkler, Charleston, S. C. (Daniel R. McLeod, Atty. Gen., State of South Carolina, James S. Verner, Asst. Atty. Gen., State of South Carolina, and Sinkler, Gibbs & Simons, Charleston, S. C., on the brief), for appellee.

Before SOBELOFF, Chief Judge, SOPER, Circuit Judge, and HOFFMAN, District Judge.

HOFFMAN, District Judge.

We have considered the merits of this controversy on two prior occasions.[1] Upon rehearing following our first opinion, we adhered to the applicability of the Pennsylvania rule, but remanded the

1. The Fort Fetterman v. South Carolina State Hwy. Dept., 4 Cir., 261 F.2d 563.

The Fort Fetterman v. South Carolina State Hwy. Dept., 4 Cir., 268 F.2d 27.

case to the District Court for specific findings.

Essentially there are two questions for determination. One involves the alleged protrusion of the gear racks and whether this constituted a statutory fault; the other concerns the admitted violation of the permit issued by the War Department prior to the construction of the Ashley River bridge with regard to the maximum elevation of the raised bascule spans.

■ As to the gear racks, we have heretofore proceeded on the assumption, conceded in argument by proctors for both parties, that the plans and specifications must be considered as a part and parcel of the permit to determine whether the bridge was constructed in accordance with the requirements of 33 U.S.C.A. §§ 401, 491. Upon remand this matter was examined at length and, from the testimony presented to the District Judge, it is apparent that when an application to construct a bridge across navigable waters wholly within the limits of a state is submitted to the Chief of Engineers for approval by him and the Secretary of the Army, the "location and plans" required by § 401 do not contemplate complete plans, specifications and finished drawings as a condition precedent to the issuance of a permit authorizing construction of the bridge. By the terms of § 491, acknowledged as a part of the Bridge Act of 1906, it is provided that, when authority is granted by *Congress* to construct and maintain a bridge across or over any navigable water of the United States, the "bridge shall not be built or commenced until the plans and specifications for its construction, together with such drawings of the proposed construction and such map of the proposed location as may be required for a full understanding of the subject, have been submitted to the Secretary of the Army and Chief of Engineers for their approval, nor until they shall have approved such plans and specifications and the location of such bridge and accessory works." Section 491 further states that

when the plans for any bridge constructed under the Bridge Act of 1906 have been approved by the Chief of Engineers and Secretary of the Army, "it shall not be lawful to deviate from such plans, either before or after completion of the structure, unless the modification of such plans has previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of the Army." In 1946, the Bridge Act of 1906 was further implemented and modernized by 33 U.S.C.A. § 525–533 but, of course, these latter statutes are not applicable to the Ashley River bridge constructed during the years 1923–25.

■ As the bridge in question was built under authority of the South Carolina Legislature (30 S.C.Stat. 1072) and the navigable portions are wholly within the State of South Carolina, it is clear that the applicable statute is 33 U.S.C.A. § 401—a fact that was not mentioned until receipt of appellant's supplementary brief on rehearing. Both parties now concede that § 401, formerly a part of the Rivers and Harbors Appropriation Act of 1899, is controlling. It is important to the extent that § 401 requires the submission and approval of "the location and plans" of the bridge, whereas § 491 calls for the submission of "the plans and specifications for its construction, together with such drawings of the proposed construction and such map of the proposed location as may be required for a full understanding of the subject."

The application for a permit required that there be submitted, among other things, the following: "(b) Plan of the bridge showing the length and height of spans, width of draw openings, position of piers, abutments, fenders, etc., and those features which affect navigation, giving on both horizontal sections and elevations the outside structure lines separating the area left for navigation from the area occupied by the bridge, and, in figures, the least clear width of openings at right angles to the axis of the channel, and the least clear heights with reference to high water, ordinary

boating water, and low water. (c) The essential features of the draw in two positions, closed and fully open." These particulars were contained within the so-called "plans" accompanying the application of the Sanitary & Drainage Commission of Charleston County for a permit to construct the bridge in question. The "plans" approved consist of one ordinary letter-size sheet entitled "Plan and Profile for Proposed Reconstruction of Bridge." It reveals the 138 feet clear opening between the raised bascule spans, but demonstrates nothing with respect to the location of the gear racks. Appellant contends that as the gear racks constitute a "feature which affects navigation", a violation of the permit follows.

It now appears from the testimony following remand that neither the Secretary of War nor the Chief of Engineers had before them the detailed drawings and specifications at the time of the issuance of the permit. The District Court has found, upon credible evidence, that the protrusion of the gear racks was not a feature affecting navigation, and was not required to be shown on plans submitted for approval. Such a finding is amply supported in the procedures followed by the Army Engineers. While undoubtedly additional particulars could have been required as a prerequisite to the issuance of the permit under 33 U.S.C.A. § 401, they were not demanded as to this application. Moreover, the interpretation placed on the permit and so-called "plans" by the Army Engineers is entitled to weight. Baltimore & Ohio R. Co. v. Jackson, 353 U.S. 325, 77 S.Ct. 842, 1 L.Ed.2d 862; United States v. Zucca, 351 U.S. 91, 76 S.Ct. 671, 100 L.Ed. 964. The interpretation of the requirements established by the Army Engineers furnishes a rational basis for its conclusions and may not be disturbed by judicial action in such instances. Rochester Tel. Corp. v. United States, 307 U.S. 125, 146, 59 S.Ct. 754, 83 L.Ed. 1147.

As so interpreted by the administrative agency, the word "plans" as de-nominated in 33 U.S.C.A. § 401 does not contemplate the submission of detailed drawings and specifications, unless specifically demanded by the agency as a condition to the issuance of the permit. The burden rests upon the party asserting the statutory fault to establish same. As to the protruding gear racks this burden has not been met and, on this point, no fault exists which calls for the application of the Pennsylvania rule.

We turn to the overhanging bascule span which, as noted, is an admitted violation of the permit. The District Court, at the first trial, did not consider the Pennsylvania rule and predicated its finding on lack of proximate cause. On remand the trial court applied the Pennsylvania rule and concluded that there was no reasonable possibility that the destruction of the bascule span, which occurred at an angle of elevation of 71 degrees, would not have occurred had the bridge been elevated to an angle of 80 to 82 degrees. Thus, the District Court held, the appellee had met the harsh burden imposed by the Pennsylvania rule.

In our former opinion (261 F.2d 563, 567), we accepted as a fact the lower court's finding that the initial contact of the ship with the bridge was at the gear rack on the downstream girder of the western bascule, and that this impact with the gear rack caused the collapse of the bascule span. On remand, appellant sought to reopen this question. The District Court properly declined to reconsider this phase of the case. Faced with this finding of the trial court, approved upon appeal, we must now examine the findings and conclusions on remand in light of the decision in McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20, modification denied, 348 U.S. 957, 75 S.Ct. 447, 99 L.Ed. 748. Unless the judgment below is clearly erroneous, we are bound by the findings of the District Court.

We do not suggest that, in applying the Pennsylvania rule, a court may not, to some extent, speculate as to

what may have happened because of the existing statutory fault. Indeed, the rule itself requires such an approach. However, this is likewise a factual matter to be determined from credible evidence, and we cannot say that the District Court was clearly in error in reaching the conclusion that no material damage would have resulted if the vessel had not struck the gear rack. We must consider the circumstances at the particular time and place, and under the conditions then prevailing, in ascertaining whether the overhang of the bascule span could have, with reasonable possibility, contributed to the disaster. The trial court concluded, after a full hearing, that the overhanging bascule span could not have contributed to the consequent damage under the peculiar circumstances of this case. Irrespective of our personal views, we cannot say that this finding is plainly erroneous, and this is so even though a portion of the vessel's superstructure would perhaps have come in contact with the overhanging bascule if the ship had proceeded through the opening without striking the gear rack. The District Judge more adequately explains his determination of this issue in the following words (177 F.Supp. 76, 84):

"The gear rack moves in a constant arc and beyond a bridge elevation of about 50° would have presented the same amount of protrusion at any bascule elevation up to the limits of opening; had the bridge been elevated to 80° or 82° at the time of this accident, instead of 71° as it was, the amount of gear rack protrusion would have been the same, but the impact of the vessel would have been against a different section of the gear rack, about a foot or so below the actual point of contact. Thus, at 80° or 82° elevation, the blow of the ship would have struck a portion of the gear rack further away from the cross-frame or stiffener which joins the downstream girder to the upstream girder at the point of the live-load shoe. The resistance of the girder and gear rack to torsion and horizontally-applied force progressively decreases as the distance from this cross-frame or stiffener increases, and, therefore, the likelihood of collapse of the bridge would be greater at the higher elevation. In any event, the fact that the bridge was elevated to 71° instead of 80° or 82° could not with any reasonable possibility have caused or contributed to the collision or to the damages resulting therefrom. These damages would have been sustained whether the bridge had been elevated 61°, 71°, 80° or 82°."

Appellant's final contention is that the fender system on the west side of the draw was located about one foot further channelward than the permit indicated. The District Court effectively disposed of this argument by stating that the force of the impact was such that the fender system, wherever placed, could not have prevented contact with the gear rack. We must assume that, on remand, the trial court concluded that the vessel would not have deviated and thus avoided striking the gear rack, irrespective of the condition of the fendering system on the western side.

If, in applying the Pennsylvania rule, we are bound by the principles in McAllister v. United States, supra—and we are unaware of any exception which places the Pennsylvania rule in any special category—we must accept the findings of the District Court. On the entire evidence we are not left with the definite and firm conviction that a mistake has been committed.

The decree appealed from is

Affirmed.